IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 18-cr-00096-LTB

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DEIVY ROMERO-LOPEZ,

        Defendant.

---

## DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant, Deivy Romero-Lopez, by and through his attorney of record, Assistant Federal Public Defender Matthew K. Belcher, and hereby submits the following objections to the Presentence Report (PSR) filed with this Court on May 29, 2019.

**Objection No. 1:**

Mr. Romero-Lopez objects to paragraph 14 of the PSR.

Specifically, Mr. Romero-Lopez objects to Probation's use of the 2018 Guidelines Manual when evidence exists that: (1) Mr. Romero-Lopez returned and was found illegally in the United States on July 11, 2016; and (2) under the then operative 2015 Guidelines Manual, Mr. Romero-Lopez' range of punishment was three to three and one-half years less severe than it currently is under the 2018 Guidelines Manual.  As such, if the Court were to sentence Mr. Romero-Lopez under the current guidelines, such a sentence would be in violation of the *ex post facto* clause of the United States Constitution.

*Facts:*

On July 6, 2013, Mr. Romero-Lopez was removed from the United States through the Port of Entry in Eagle Pass, Texas.[1]  Subsequently, Mr. Romero-Lopez illegally reentered the United States.  While the discovery indicates that Mr. Romero-Lopez estimated that he illegally reentered in September of 2016,[2] it is clear that this estimation was mistaken.  It is clear because both the discovery and the PSR accurately reflect that Mr. Romero-Lopez was arrested by the Adams County Sheriff's Office on July 11, 2016.[3]  Because of this arrest, Mr. Romero-Lopez was booked and processed through the Adams County Sheriff's Office before being released to the Washington House Detox Center.[4]  During the booking process, Mr. Romero-Lopez provided his true name, true date of birth, and the address where he was living with his family in Thornton, Colorado.[5]  Mr. Romero-Lopez verified his true name, date of birth, and nationality by providing the deputies with a Mexican ID card.[6]

After spending the night at the detox facility, Mr. Romero-Lopez was released and provided with a summons for his initial court appearance on September 19, 2016.  Mr. Romero-Lopez failed to appear at this court appearance and, accordingly, a Failure to Appear warrant was issued by the court.[7]  On May 27, 2017, Mr. Romero-Lopez was arrested on the outstanding Failure to Appear warrant and subsequently sentenced to a term of probation for the misdemeanor offense,

---

[1] PSR at paragraph 10.
[2] Which still predates the change in the guidelines, which occurred in November of 2016.
[3] PSR at paragraph 31.  Government's discovery at Bates #INV_00000025.
[4] See arrest report (Attachment 1).
[5] *Id.*
[6] *Id.*
[7] PSR at paragraph 31.

to run concurrent with a new felony conviction he sustained on May 24, 2017 for Felony Menacing Real/Simulated Weapon.[8]

For approximately six months, Mr. Romero-Lopez was on probation in Adams County prior to his arrest on January 3, 2018, in El Paso County, Colorado, for Manufacture of a Controlled Substance.[9]   On the same date of his arrest, immigration officials met with and interviewed Mr. Romero-Lopez.  Subsequently, Mr. Romero-Lopez was charged in federal court for the instant offense.[10]

*Law:*

The *Ex Post Facto* Clause[11] is violated when a defendant is sentenced under Guidelines promulgated after he commits criminal acts and the new version provides a higher sentencing range than the version in place at the time of the offense.[12]  Cognizant of this, the Commission included a provision in the Guidelines, U.S.S.G. § 1B1.11(b)(1), which instructs a sentencing court to use the Guidelines Manual in effect on the date the offense of conviction was committed *IF* the court determines that using the Guidelines Manual in effect on the date of sentencing would violate the *Ex Post Facto* Clause of the United States Constitution.

The "offense of conviction" here is Illegal Reentry of a Previously Removed Alien, in violation of 8 U.S.C. § 1326.  One commits an illegal reentry offense by: (1) being an alien who has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding; and (2) entered, attempted to enter,

---

[8] *Id.*
[9] PSR at paragraph 33.
[10] PSR at paragraph 8.
[11] U.S. Const. art. I, § 9, cl.3.
[12] *Peugh v. United States*, 569 U.S. 530 (2013).

or at any time was found in the United States.[13]  Furthermore, a defendant is "found" in the United States when the government knows, or could have known through the exercise of diligence typical of law enforcement, the following: (1) the defendant is a prior deportee; (2) the defendant is illegally present in the United States; and (3) the defendant's whereabouts.

*Argument:*

On July 11, 2016, Mr. Romero-Lopez was arrested by the Adams County Sheriff's Office. During this arrest, Mr. Romero-Lopez provided the deputies with a Mexican ID card which contained his true name and true date of birth.  Additionally, Mr. Romero-Lopez provided the deputies with his address and fingerprints.  After being booked and processed, Mr. Romero-Lopez was then taken to a detox facility for the night.  The next morning he was released and returned home.

While nothing in the discovery that has been provided by the government, to date, indicates that immigration officials were directly contacted by Adams County Sheriff's Office to inform them of Mr. Romero-Lopez's arrest, there is evidence to suggest that immigration, nevertheless, was notified of Mr. Romero-Lopez's arrest and, through the exercise of diligence typical of law enforcement, could have ascertained his whereabouts.

A. Priority Enforcement Program:

On November 20, 2014, then Department of Homeland Security Secretary Jeh Johnson executed a memorandum creating the Priority Enforcement Program ("PEP").[14]  Among other things, PEP relied on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to the FBI for criminal background checks to determine whether that

---

[13] *United States v. Olivas-Perea*, 297 F.Supp.3d 1191, 1207 (D. New Mexico 2017).
[14] See Archived Content from DHS describing PEP (Attachment 2).

individual was a priority for removal.  If they were, they would seek their transfer from state custody.  If not, often times, they would simply request that the local jurisdiction inform ICE of when the individual would be released from their custody.  The Department of Homeland Security described the program as follows:

> PEP begins at the state and local level when an individual is arrested and booked by a law enforcement officer for a criminal violation and his or her fingerprints are submitted to the FBI for criminal history and warrant checks. This same biometric data is also sent to U.S. Immigration and Customs Enforcement (ICE) so that ICE can determine whether the individual is a priority for removal, consistent with the DHS enforcement priorities described in former Secretary Johnson's November 20, 2014 Secure Communities memorandum. Under PEP, ICE will seek the transfer of a removable individual when that individual has been convicted of an offense listed under the DHS civil immigration enforcement priorities, has intentionally participated in an organized criminal gang to further the illegal activity of the gang, or poses a danger to national security.[15]

The Priority Enforcement Program was in effect from November 20, 2014, until January 25, 2017, when President Trump reinstated Secure Communities by Executive Order No. 13768, entitled *Enhancing Public Safety in the Interior of the United States*.[16]  Secure Communities was an enforcement program that predated PEP, both of which, however, relied on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to identify illegal aliens in their custody.[17]

Accordingly, it appears that under either PEP or Secure Communities, once Mr. Romero-Lopez was arrested, processed, and his fingerprints ran, ICE would have received notice of Mr. Romero-Lopez's illegal presence.  This notice would have been received by ICE through the Alien Criminal Response Information Management System (ACRIMe), which is an information

---

[15] *Id*.

[16] See description of Secure Communities from Department of Homeland Security website (Attachment 3).

[17] See Archived Content from DHS describing PEP (Attachment 2).

data system used by ICE to receive and respond to immigration status inquiries made by other agencies about individuals arrested, subject to background checks, or otherwise encountered by state or local agencies.[18]   A similar scenario occurred in *United States v. Barcenaz-De Paz*, 19-CR-00250-REB.[19]

Given this technology, which appears to have been in place at the time of Mr. Romero-Lopez's arrest on July 11, 2016, even if not directly contacted by Adams County Sheriff's Office, ICE had constructive knowledge of his illegal presence within the United States.  Adams County Sheriff's Office processed and booked Mr. Romero-Lopez prior to releasing him to the detox facility.  Part of this booking process was taking fingerprints from Mr. Romero-Lopez to run a background check through the FBI.  This background check, under PEP, would have sent the same biometric information to both the FBI and ICE.   As such, at the very least, Immigration had constructive knowledge of Mr. Romero-Lopez's presence in the United States.[20]

B.  Exercise of Diligence Typical of Law Enforcement:

Once informed of Mr. Romero-Lopez's arrest, ICE would have easily been able to ascertain that he was a prior deportee illegally present in the United States.  That is because, here, Mr. Romero-Lopez provided law enforcement with his true name, true date of birth, actual address, and fingerprints. In addition, by exercising the diligence typical of law enforcement, ICE could have obtained his address from the Adams County Sheriff's Office and sent agents there to question and/or arrest Mr. Romero-Lopez the next day.  Failure to do so, whether it be due to resource constraints or based on the restraints placed on ICE by the Priority Enforcement Program,

---

[18] See Privacy Impact Assessment Update for ACRIMe (Attachment 4).
[19] See Report of Investigation, page INV_00000002, last sentence first paragraph
    (Attachment 5).
[20] *See e.g. United States v. Gomez*, 38 F.3d 1031 (8th Cir. 1994)

is of no consequence.  If ICE was aware, or should have been aware of Mr. Romero-Lopez' presence, but chose not to act, they should be held to that choice when determining the appropriate guidelines range.[21]

*Conclusion:*

Mr. Romero-Lopez was found to have illegally reentered the United States when he was arrested by Adams County Sheriff's Office on July 11, 2016.  At that time, the 2015 Guidelines Manual would have recommended a sentencing range for the instant offense of 21 to 27 months. However, as he currently sits, Mr. Romero-Lopez is facing an advisory range of 57 to 63 months. To sentence Mr. Romero under the 2018 Guidelines Manual, which was promulgated after he committed his criminal acts, and which provides a far greater sentencing range than the version in place at the time of the offense, would be a violation of the *Ex Post Facto* Clause to the United States Constitution.

**Objection No. 2:**

Mr. Romero-Lopez objects to paragraph 32 of the PSR.

Specifically, Mr. Romero-Lopez objects to Probation's assessment of three criminal history points for the August 28, 2018, revocation sentence of one-year with the Department of Corrections.  Probation is correct that, under § 4A1.2(k), when faced with a sentence upon revocation, to determine criminal history points, one would add the original term of imprisonment to any term of imprisonment imposed upon that revocation.  The problem is that Mr. Romero-Lopez did not receive a "sentence of imprisonment" when originally sentenced on August 4, 2017. While he did receive 90 days in jail, that jail sentence was fully suspended in lieu of three years of

---

[21] *United States v. Olivas-Perea*, 297 F.Supp.3d at 1210.

probation.   And,   under   §   4A1.2(b),   the   term   "sentence   of   imprisonment"   does   not   include suspended sentences.

As   such,   Mr.   Romero-Lopez   should   receive   only   two   criminal   history   points   for   the sentence of imprisonment he sustained on August 28, 2018, as it was a sentence of greater than 60 days but less than one year and one month.   In isolation, this would drop his total criminal history points to 13 instead of 14, but he would remain in criminal history category VI.

**Objection No. 3**:

Mr. Romero-Lopez objects to paragraph 36 of the PSR.

Specifically,   Mr.   Romero-Lopez   objects   to   Probation's   assessment   of   two   additional criminal history points for his commission of the instant offense while under a criminal justice sentence   for   Adams   County   District   Court,   Case   Number   17CR1930.    As   stated   above, Mr. Romero-Lopez was found to have illegally returned to the United States on July 11, 2016, when he was arrested by Adams County Sheriff's Office for the misdemeanor offense of Driving While  Ability  Impaired.    At  that  time,  Mr.  Romero-Lopez  was  not  under  a  criminal  justice sentence.   And, as such, the two point criminal history enhancement cited by Probation in paragraph 36 of the PSR is not warranted.   The offense cited by Probation in support of the assessment did not occur until almost 13 months after Mr. Romero-Lopez was found in the United States and, therefore, cannot be a basis for the § 4A1.1(d) enhancement.

In  isolation,  this  would  result  in  12  criminal  history  points,  not  14,  and  would  place Mr. Romero-Lopez  in  criminal  history  category  V,  not  criminal  history  category  VI.    In conjunction with the above objection, in total, Mr. Romero-Lopez would have 11 criminal history points, but remain in criminal history category V.   In criminal history category V, using the

2015 Guidelines Manuel, Mr. Romero-Lopez's advisory guideline range would be 21 to 27 months.

**Objection No. 4:**

Mr. Romero-Lopez objects to Probation's recommendation, found on page R-1, that the Court impose a three-year term of supervised release.

First, pursuant to U.S.S.G. § 5D1.1(c), the Commission advises sentencing courts to forgo the imposition of a term of supervision when the defendant is a deportable alien who likely will be deported after imprisonment. The reason for this advice is two-fold: (1) unless the defendant returns legally, supervision is not necessary; and (2) if the defendant returns illegally, the need to afford adequate deterrence and protect the public is adequately served by a new prosecution.

Additionally, here, Mr. Romero-Lopez has, at a minimum, one year of parole that will follow his five-year sentence in the Colorado Department of Corrections. Given this, a concurrent term of federal supervision is unwarranted.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

/s/ Matthew K. Belcher
MATTHEW K. BELCHER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  Matthew_Belcher@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2019, I electronically filed the foregoing ***Defendant's Objections to the Presentence Report*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

> Daniel Robert McIntyre, Assistant U.S. Attorney
> Email:  daniel.mcintyre@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

> Deivy Romero-Lopez
> via mail

> /s/ Cecilia Hernandez
> Cecilia Hernandez, Legal Assistant
> Office of the Federal Public Defender