**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 18-cr-00096-LTB


**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**DEIVY ROMERO-LOPEZ,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Sentencing Hearing)**
_____

        Proceedings before the HONORABLE LEWIS T. BABCOCK,
Senior Judge, United States District Court, for the
District of Colorado, commencing at 9:01 a.m. on the 19th
day of July, 2019, Byron G. Rogers United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
DANIEL R. MCINTYRE, U.S. Attorney's Office, 1801
California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
MATTHEW K. BELCHER, Office of the Federal Public Defender,
633 17th St., Suite 1000, Denver, CO 80202

| | |
|---|---|
| 1 | **JULY 19, 2019** |
| 2 | (Proceedings commence at 9:01 a.m.) |
| 3 | THE COURT:  Please be seated. |
| 4 | 18-cr-96, United States of America v. Deivy |
| 5 | Romero-Lopez, who appears in person, together with his |
| 6 | attorney, Mr. Belcher. |
| 7 | Mr. McIntyre; correct -- |
| 8 | MR. MCINTYRE:  Correct, Your Honor. |
| 9 | THE COURT:  -- for the Government. |
| 10 | So, please, would you swear our interpreter. |
| 11 | (The interpreter is sworn.) |
| 12 | THE COURT:  The matter is before me for sentencing. |
| 13 | Our probation officer is Meaghan Mills. |
| 14 | PROBATION OFFICER:  Good morning, Your Honor. |
| 15 | THE COURT:  Good morning. |
| 16 | Let's see.  Mr. McIntyre, you have reviewed the |
| 17 | presentence report in the light of 18 U.S.C. Section 1983. |
| 18 | And you filed no objections to it? |
| 19 | MR. MCINTYRE:  Correct, Your Honor. |
| 20 | THE COURT:  Mr. Belcher, you have reviewed the |
| 21 | report in the same statutory light with your client.  You |
| 22 | have filed specifically four objections to the report; |
| 23 | correct? |
| 24 | MR. BELCHER:  That's correct, Your Honor. |
| 25 | THE COURT:  And Mr. McIntyre has filed a response |

1    to those objections.  Let me see if I can recap where I

2    think the parties are with respect to those objections.

3          The first objection is significant, in that the

4    defense contends that the 2015 guidelines should apply

5    here rather than the 2018 guidelines.  I think I would

6    like to address that one first.

7          Mr. Belcher, you up to further argue that?  I have

8    read your objection.

9          MR. BELCHER:  Sure, Your Honor.  As the Court has

10    indicated, we have objected to the applicable guideline.

11    We believe its the 2015 guideline, and in summary of the

12    lengthy objection I filed on that point, given the

13    importance that it has to Mr. Romero, I will simply

14    summarize the facts that Mr. Romero-Lopez was arrested by

15    the Adams County Sheriff's Office on July 11, 2016.  That

16    is prior to the change in the guidelines that completely

17    overhauled the guidelines applicable to illegal re-entry

18    cases; 2L1.2 that went into effect in November of 2016.

19          Our argument focuses on the part or the points

20    that, unlike some other cases, where these arguments are

21    made simply because a client, post-arrest, claims he came

22    back during that period of time without any sufficient

23    evidence to support that.

24          Here, we have an actual arrest; a police report

25    detailing his arrest; the fact that he was processed using

1    his real name, his real date of birth, his Mexican ID
2    card, sets him apart from some of the cases that I cited
3    where the courts found that he wasn't found, for purposes
4    of the guidelines, because he was using an alias or they
5    couldn't ascertain his legal status.
6         Here, Mr. Romero used his real name, date of birth,
7    address, was fingerprinted, and prior to being released,
8    he was cleared through NCIC.  Clearing him through NCIC
9    would have, in my opinion, triggered the biometric data
10   operations that Immigration has under PEP at the time, the
11   Priority Enforcement Program.
12        And, essentially I have argued, Your Honor, that if
13   they did not have actual knowledge, they at least had
14   constructive knowledge of his existence in the country,
15   and through diligence typical to law enforcement, could
16   have easily got his police report, the address that he
17   provided, and gone and contacted him then.  And given
18   that, I believe it is only fair to apply the guidelines in
19   effect at the time that we know he was illegally back in
20   the United States.
21        THE COURT:  Mr. McIntyre, do you want to respond,
22   please?
23        MR. MCINTYRE:  Your Honor, I think the parties both
24   lay out the similar or the same tests for what constitutes
25   being found; it is a term of art for illegal re-entry

1    cases.  So, the key issue here is what law enforcement has

2    to be aware of his presence.

3          In this case, Mr. Belcher is arguing that the fact

4    that he was encountered by state authorities can somehow

5    be imputed to federal authorities for purposes of, I

6    guess, ending the continuing offense of illegal re-entry.

7          I think the case law is contrary to that.  I think

8    it is clear that federal immigration authorities are the

9    authorities in question.  That if they don't have actual

10   or constructive knowledge, the offense continues because

11   he hasn't been found, the offense hasn't been terminated.

12         In this case, there is no evidence that the contact

13   with the local state authorities in Adams County, that

14   sufficient information or any information, in fact, was

15   conveyed to ICE to alert them to his presence; the fact

16   that he was an illegal alien.

17         It is simply insufficient to say, he was arrested,

18   I think it would have triggered this program, when there

19   is no evidence that it did.  And it is the Government's

20   belief that there was absolutely no information conveyed

21   to ICE at that time.

22         So the suggestion that somehow they could have

23   obtained his police report, obtained his address, I think

24   doesn't withstand scrutiny, because there are probably

25   hundreds or thousands of people that are contacted with

1    local law enforcement every day, and there is no way for

2    ICE to know who those people are absent some notification.

3         So, while in a sense it could have been easy for

4    them to obtain the police report had they known about it,

5    there is simply nothing to alert them to his presence at

6    that time.  Given the fact they didn't know about it, and

7    there is no way they could have known about it based on

8    the mere contact with local authorities, he was not found

9    under the statute, and the offense continued to run until

10   he was encountered in 2018.

11        I think beyond --

12        THE COURT:  You say the word "found" is a term of

13   art.  Is your point that until ICE "finds" the individual,

14   he is not found?

15        MR. MCINTYRE:  Correct, Your Honor.  So what the

16   Tenth Circuit said in the Villarreal-Ortiz case that I

17   cited, on page 2 of my response, 553 F.3d 1326, at page

18   1330, a Tenth Circuit case from 2009, they established a

19   test that must be met in order for a defendant to be

20   "found" under 1326.

21        What they say is that 1326 for illegal re-entry is

22   a continuing offense.  It begins when you enter the United

23   States and continues until you are found, however long

24   that is.  So, until that three-part test is met, the

25   offense continues to accrue.

1          And I think the defendant and Mr. Belcher agree

2     that the found date is the effective date; it is the last

3     date of the continuing offense that the Court considers.

4          So, the three-part test is as follows:  Immigration

5     authorities -- federal immigration authorities have to

6     know that the alien is a prior deportee, that he is

7     illegally present in the United States, and his location.

8          The federal immigration authorities knew nothing

9     about this contact in 2016 with Adams County because they

10    weren't notified through officer communication, through a

11    fingerprint hit.  There is simply no information about

12    that contact communicated to them, so there is no way for

13    them to know he was present.  There is nothing to alert

14    them to, perhaps, investigate further, obtain those police

15    reports, obtain the address.  There is simply no

16    notification.  There is absolutely no way they could have

17    known, absent that notification.

18         In my motion, I kind of -- I set out two dates that

19    arguably constitute the found date, but both of those are

20    well after the implementation of the new guidelines.  So,

21    whichever one the Court goes with, I think this part of

22    Mr. Belcher's argument fails.

23         THE COURT:  So your argument with regard to the May

24    27 date is that the defendant was booked into jail and ICE

25    was notified on that date?

1          MR. MCINTYRE:  Correct.  So, they were notified

2    electronically.  So, the January 3rd date is when they

3    actually physically encountered him.  The May 27, 2017

4    date they received the notification.  So I think there is

5    a reasonable argument that the thee-part test was met.

6    Because once they have that notification, regardless of

7    whether or not someone is actually reviewing those hits, I

8    think it is fair for the Court to impute the knowledge of

9    his presence and the other contents of their databases to

10   them at that time.  Whether or not they actually put it

11   together, I think Mr. Belcher's argument that they

12   reasonably could have at that time, is much, much

13   stronger, just because they have all of the pieces, and it

14   is their responsibility to put it together.

15          So, I think -- there is no evidence they actually

16   did.  But, I think, you know, the tie with respect to that

17   argument should go to the defendant.  I made that point in

18   my argument, as well.  But, regardless of how you slice

19   it, the 2016 date is absolutely irrelevant for this

20   purpose, just because there was no notification to federal

21   authorities.

22          THE COURT:  Thank you.  Well, there are two things

23   that persuade me that the 2016 date doesn't apply, nor

24   does the 2015 guideline.

25          First of all, under oath, at the plea hearing, the

1      defendant admitted that he was found in the District of

2      Colorado on January 3, 2018.  That is a judicial

3      admission, on the record, under oath.

4          The fall-back date relied upon by the Government of

5      May 27, can't arguably apply because he was identified and

6      ICE was notified electronically of his Adams County

7      location and arrest.  So either that notification to ICE

8      or the actual physical encounter on January 3, 2018,

9      together with the admission on the guilty plea, which is

10     also set forth on page 4 of the plea agreement, an agreed

11     statement of facts, convinces me that the defense argument

12     must fail about the earlier guideline calculation.

13         So, I will overrule or deny that first objection.

14         Now, the second objection we can deal with a little

15     easier, and that is because the Government, as I

16     understand it, agrees with the defense that the conviction

17     in paragraph 32 should receive 2 criminal history points.

18     Is that correct, Mr. McIntyre?

19         MR. MCINTYRE:  That's correct, Your Honor.

20         THE COURT:  Mr. Belcher?

21         MR. BELCHER:  That's correct, Your Honor.

22         THE COURT:  Okay.  So, I will sustain that

23     objection.

24         As to the Objection No. 3, I think the Government

25     also agrees that no criminal history points should be

1    added for being under a criminal justice sentence at the

2    time of the commission of the offense.

3          The Government writes, "While the Government

4    believes January 3, 2018 is technically the correct

5    "found" date --" I also agree with that "-- based on the

6    discussion above regarding the defendant's May 27, 2017

7    arrest, the Court should give the benefit of the doubt to

8    the defendant and use that date."

9          Now, when you say "that date," do you mean the May

10   27th date?

11         MR. MCINTYRE:  Yes, Your Honor.  I am sorry for

12   that lack of clarity.

13         THE COURT:  So, in conclusion, then, I think it is

14   agreed that the defendant was not under a criminal justice

15   sentence on May 27, 2017.  So the two points would not

16   apply; correct, Mr. McIntyre?

17         MR. MCINTYRE:  That is my position, Your Honor.

18         THE COURT:  Mr. Belcher?

19         MR. BELCHER:  No objection.

20         THE COURT:  Okay.  So, then we get to the objection

21   -- let me see if this, then, works out to a calculation.

22   I think, therefore, that the offense level would be 19,

23   with a Criminal History Category Level of V, yielding a

24   guideline range of 57 to 71 months.

25         Mr. McIntyre, do you agree with that?

1          MR. MCINTYRE:  Yes, Your Honor.

2          THE COURT:  Mr. Belcher?

3          MR. BELCHER:  Given the Court's rulings, I do.

4          THE COURT:  Okay.  You got that Ms. Mills?

5          PROBATION OFFICER:  Yes.

6          THE COURT:  Okay.  The last objection, which is No.

7     4, has to do with whether or not, I think, the defendant

8     should be placed on supervised release.  And I think -- I

9     haven't even heard from the defendant yet personally.  Let

10    me defer that until I have an opportunity to hear -- I

11    think the Government said it is up to me, and would defer

12    to my discretion; right?

13         MR. MCINTYRE:  That's correct, Your Honor.

14         THE COURT:  So, what I want to do now, Mr. Romero,

15    if you and your attorney would go to the podium.

16         Mr. Belcher, your sentencing statement first,

17    including addressing the supervised release question.

18         MR. BELCHER:  Thank you, Your Honor.  As I have

19    indicated, I know it has been overruled, but my belief was

20    the guideline range was 21 to 27 months, and I still

21    believe that under the 3553(a) analysis, a sentence within

22    that range is appropriate given his personal history,

23    characteristics, and the nature and circumstances of the

24    offense.

25         Of note, I think it's pretty reasonable, and I

1    don't think there is much argument to the fact that if one

2    commits this crime again a second time, an incremental

3    increase and punishment is warranted to address that

4    subsequent violation.

5         And I would request a sentence of 24 months, which

6    would be approximately 8 times greater than what he

7    received for his original 1326.

8         THE COURT:  You are requesting a sentence of what?

9         MR. BELCHER:  24 months, Your Honor.

10        THE COURT:  The range is 57 to 71 months.

11        MR. BELCHER:  I understand that, Your Honor.

12        THE COURT:  So, is this a variance that you are

13   asking?

14        MR. BELCHER:  It is now.  My position coming into

15   sentencing was the guideline range was 21 to 27 months.

16   We were asking for a sentence within the range we thought

17   was appropriate.  I guess, given the rulings now, it would

18   be considered that, Your Honor.

19        THE COURT:  Well, on what basis do you think he is

20   entitled to a variance to that degree?

21        MR. BELCHER:  Many bases, Your Honor.  First the

22   personal history and characteristics.  As I was just

23   stating, I understand he committed this offense prior, but

24   I don't believe a 20-times greater sentence is necessary

25   in order to achieve the goals of sentencing under 3553(a).

1          And, despite the Court's rulings, I still think it

2     is relevant toward the ultimate sentence under 3553(a)

3     that we know for a fact he was here in the United States,

4     he had come back to the United States under a guideline

5     that would have recommended a sentence of 21 to 27 months.

6     And the change in the guidelines, I don't believe -- I

7     believe, creates a recommendation that is greater than

8     necessary for Mr. Romero's case.

9          I believe a 2-year sentence is far greater than he

10    received last time and is adequate to address the fact

11    that he returned illegally, and I think the deterrence, to

12    promote respect for the public, and just punishment would

13    be met given that sentence, Your Honor.

14         THE COURT:  Mr. McIntyre, do you want to make a

15    sentencing statement before I further hear from the

16    defense?

17         MR. MCINTYRE:  Yes, Your Honor.  Should I make it

18    from the podium, or is my table fine?

19         THE COURT:  Yeah, that's fine.

20         MR. MCINTYRE:  Your Honor, I am asking for a

21    sentence at the bottom-of-the-guideline range of 57

22    months.  I am also asking the Court to impose a term of 3

23    years of supervised release.

24         THE COURT:  I thought you were standing neutral on

25    that question or mute on the supervised release.

 1        MR. MCINTYRE:  No, my response to that was I didn't

 2   believe it was appropriate as an objection to the PSIR.  I

 3   indicated in my filing I would reserve argument for today.

 4   So I think it is more appropriate for argument to the

 5   Court.

 6        So, my statement earlier is that the ultimate

 7   decision is within the Court's discretion, so the Court

 8   can do whatever it wants.  I didn't mean by that I wasn't

 9   going to take a position.

10        THE COURT:  Thank you.

11        MR. MCINTYRE:  I believe a guideline sentence is

12   warranted.  I think when you look at the defendant's

13   criminal and immigration history, there is a couple of

14   concerning patterns.

15        With respect to his immigration history, he has

16   three prior removals, which means he has four illegal

17   re-entry re-entries.  The last two of those resulted in

18   federal convictions for immigration crimes.  The first one

19   was a misdemeanor 1325.  And, more recently, in 2013, was

20   a felony 1326.

21        And Mr. Belcher is correct that the relative

22   sentences, there is a big discrepancy there.  I believe it

23   was 88 days for last 1326.  So, if that was his only

24   criminal history between then and now, if it was just his

25   last illegal re-entry and he got 88 days, now he is back,

```
1    I think Mr. Belcher's argument would stand up a lot
2    stronger.
3          But, I think what is concerning is these removals,
4    these illegal re-entries, they simply punctuate a long
5    history of committing other criminal offenses that are
6    quite serious.
7          So, since his last illegal re-entry, he was removed
8    on July 6, 2013.  Three days later he was back in the
9    country.  And we know that because he was arrested for and
10   convicted for DWAI.  That was the 2016 conviction that we
11   discussed with respect to the found date.
12         But, he didn't stop there, because in May of 2017,
13   he was arrested for felony menacing; a much more serious,
14   dangerous, violent offense.  He was given a term of
15   probation, which he violated, and was eventually sentenced
16   to the Department of Corrections.  And while on probation
17   for the felony menacing offense, which itself is a very
18   serious offense, he was also arrested for manufacturing of
19   a controlled substance, for which he was again sentenced
20   to the Department of Corrections for a period of 5 years.
21         So, we don't just have his last 1326, we have this
22   intervening period of years where his criminal conduct is
23   escalating in seriousness and dangerousness.  He is
24   committing these crimes while on probation, while here
25   illegally.
```

1          So, I think when that fact is combined with the

2     fact that his prior 1326, for which he served a period in

3     prison, a significant increase is necessary to deter the

4     defendant from coming back, to deter the defendant from

5     committing additional crimes.

6          There is a lot of times you will see a person

7     committing the same type of crime over and over.  This

8     defendant engages in a variety of criminal conduct, all of

9     which is dangerous.  But the DWAI, felony menacing, and

10    manufacturing of a controlled substance, that is quite a

11    broad portfolio of criminal activity in such a short

12    period of time.

13         When you look at the need to protect the public

14    from the defendant and his escalating pattern of criminal

15    activity and disregard for the laws of the United States,

16    I think there might be an argument for even an

17    above-the-bottom-of-the-guideline sentence.

18         But, I think all things considered, I think the 57

19    months is sufficient, but not greater than necessary, to

20    achieve the purposes of sentencing under the statute.

21         I believe the period of supervised release is also

22    appropriate given his repeated history of illegally

23    re-entering.  His first entry into the United States, at

24    least according to immigration records, was 2010.  So he

25    doesn't have an extremely long history here.  But, to have

1    four illegal re-entries, three removals, and two

2    immigration-related convictions is pretty serious.

3    Clearly something is drawing him back, that is

4    overpowering whatever consequences he believes he is going

5    to face.

6         So, I think in addition to the 57 months of

7    incarceration, 3 years of supervised release is

8    appropriate as an additional deterrent on the tail end of

9    that for once the defendant is removed and back to his

10   home country and he is faced with the choice whether or

11   not to come back.  So I think that is appropriate.  Thank

12   you.

13        THE COURT:  Mr. Belcher, your final sentencing

14   statement, please.

15        MR. BELCHER:  Yes, Your Honor.  Again, I neglected

16   to address the supervised release portion my first go

17   around, so let me start with that real quick.  The reason

18   I am not recommending supervision, Your Honor, is

19   two-fold.  One, because the guidelines in this scenario

20   don't recommend a term of supervision.  And the reason for

21   that is set forth; they are not going to be supervised.

22   Supervised release is not a tool to be used to punish

23   individuals, it is supposed to be a benefit to them.

24        If he is not going to be supervised, there is no

25   reason to impose it.  Furthermore, if he re-enters the

1    United States, as the guidelines note, he can be punished

2    again by a conviction for 1326.

3         So, there is no need to impose a term of

4    supervision in this scenario when someone is being

5    deported from the United States.  Furthermore, if there is

6    some deterrence aspect to being on supervision when

7    deported, he is going to be on a mandatory 1-year parole

8    under the Colorado Department of Corrections once he is

9    finally released on that.  And, if he returns illegally

10   during that period of time --

11        THE COURT:  I was wondering how the 1-year parole

12   came into effect here.  That is because of the state

13   sentence?

14        MR. BELCHER:  Yes, Your Honor.  He has a 5-year DOC

15   sentence with a mandatory 1 year of parole.  His mandatory

16   release date is sometime in 2020 -- or 2022, I believe,

17   with a parole eligibility date sometime in 2020.

18        THE COURT:  So you are saying that parole here kind

19   of translates into a de facto supervised release?

20        MR. BELCHER:  Yes, in the sense of the deterrence

21   that the Government is arguing, because no one is going to

22   actually supervise him.  If they find him, they are not

23   going to supervise him, they are going to revoke him.

24        THE COURT:  If he comes back here illegally, he

25   will be subject to that parole supervision.  I am sure he

1    would immediately report to the state parole office.

2         MR. BELCHER:  If he could do it legally, he would,

3    Your Honor.

4         THE COURT:  Yeah.  Okay.

5         Let me address the variance first.  And in doing

6    so, I go to the basic statutory requirement in the

7    imposition of any sentence, and this will ultimately, I

8    think, apply with regard to a discretionary sentence

9    within the guideline range.

10        But, first let me address it in terms of a

11   variance.  And it is the burden of the defense to persuade

12   the Court of the variance -- in this case, that a very

13   significant variance is appropriate.

14        3553(a) requires that a sentence be sufficient, but

15   not greater than necessary, to comply with the purposes

16   set forth in paragraph 2 of that subsection.  I should

17   consider the nature and circumstances of the offense and

18   the defendant's history and characteristics.

19        In this respect, I note that, indeed, I think this

20   is the third immigration conviction, sixth felony

21   conviction.  Paragraphs 27 through 33 of the presentence

22   report reflects the nature of the criminal history.  His

23   Criminal History Category, I have found, is a V, which is

24   high.

25        So, I want to back up, I want to hear what

1    Mr. Romero has to say.  Tell me whatever you want to tell

2    me.

3            THE DEFENDANT:  Well, first of all, I would just

4    like to say I am very aware of the mistakes I have made.

5    I am human, and I have made mistakes.  But, I would like

6    you to know that I have been working on making myself a

7    better person while I am in prison so I can be a better

8    person for my wife and my children.

9            THE COURT:  How many children do you have?

10           THE DEFENDANT:  Well, I have two and my wife has

11   two, so there are four.

12           THE COURT:  You are married?

13           THE DEFENDANT:  I was going to be arrested -- I was

14   going to be married before I was arrested, and we are

15   planning on going to Mexico.

16           THE COURT:  All right.  Go ahead.

17           THE DEFENDANT:  And I would like you to know that I

18   have been attending school.  I have been attending

19   programs to improve myself and be a better person and a

20   good example for my children so that they will do good and

21   not make mistakes like I have.

22           THE COURT:  What programs have you been working

23   with?

24           THE DEFENDANT:  I have been going to alcohol and

25   drug programs and attending school.

1             THE COURT:  What are you studying in school?

2             THE DEFENDANT:  I have been going to ESL classes

3     and also to get my GED.  Because I have that in Mexico,

4     but I would like to get it here.  And, also, to take days

5     off so that I can be back with my family again.

6             THE COURT:  Go ahead.  Tell me what you want to

7     say.

8             THE DEFENDANT:  Well, I'm not very good at

9     speaking, but I would just like to say I am aware I made

10    mistakes, and my future is in your hands.  So, thank you.

11            THE COURT:  Okay.  Thank you.

12            Now, let me go back to my consideration of the

13    factors in 18 U.S.C. Section 3553(a).  You are 29 years

14    old.  And being 29 years old with a Criminal History

15    Category Level of V, speaks to your history and your

16    characteristics.  It can't be ignored.  And, as I say, the

17    paragraphs in the presentence report reflect this

18    significant criminal history.

19            The nature and circumstances of your offense I

20    consider in the light that it is; this case is your third

21    immigration conviction.  Were there three convictions

22    before today?

23            PROBATION OFFICER:  This is the third conviction,

24    Your Honor.

25            THE COURT:  Okay.  This is the third conviction.

```
1          I also note you have one, two, three four, five
2     aliases.  That tells me that you are utilizing these
3     aliases to circumvent the immigration laws of this
4     country.  I see this a lot, where somebody says, well,
5     gee, let's see, I will take a different name, and using a
6     different name, maybe get some new papers.  And they're
7     readily available somewhere between $50 and $150.  So that
8     indicates that your mindset is one to repeatedly violate
9     the immigration laws of this country.
10          When I address -- and I am going to say something
11    parenthetically, because when I address the sentence, the
12    individual sentencing decision for Mr. Romero, I do not
13    consider all that flack that is flying around in our
14    country regarding immigration issues.  That doesn't bear
15    on my decision at all.
16          What I do consider is that your history and
17    characteristics reflect this propensity to commit not only
18    immigration crimes, but other crimes.  So, the nature and
19    circumstances of this offense is that you, having been
20    deported or removed from this country previously, you
21    still entered this country illegally, which gives rise to
22    your sentencing today on your guilty plea.
23          So, the sentence that I impose should reflect the
24    seriousness of the offense, and we have talked about that.
25    Promote respect for the law; I considered that.  Just
```

1   punishment; that is a rhetorical consideration, because

2   that is the same thing as a sentence that is sufficient,

3   but not greater than necessary, to comply with all of the

4   purposes in the statute.  Deterrence to others; I'm never

5   real sure how a sentence in an individual case necessarily

6   deters others.  There is no publicity in this case.  I

7   don't know.  Protect the public from further crimes; given

8   your criminal history, I am considering that.  Considering

9   the kinds of sentences that are available, and the

10  sentence in your case should not be too different from

11  sentences imposed against other individuals under the same

12  or similar circumstances.

13          Well, first, the request for a variant sentence, it

14  is a significant variance.  And in consideration of all

15  which I have addressed here, I think that would denigrate

16  respect for the law and not be constant with the

17  requirements set forth in 18 U.S.C. Section 3553(a).

18          Rather, the guideline range set forth, as I have

19  now determined it to be, of 57 to 71 months, is a

20  guideline which meets the requirements of 3553(a) to

21  render a sentence that is sufficient, but not greater than

22  necessary, to comply with the purposes set forth in that

23  statute.  So the sentence will be within the guideline

24  range.

25          Having said that, and also relevant to the question

1    of supervised release, I want to note a couple of things.

2    First of all, I think you are a pretty smart person.  I

3    think you can obtain in Mexico, and possibly through the

4    Federal Bureau of Prisons, additional education.

5         As set forth in paragraph 57 of the presentence

6    report, you got a high school diploma in Mexico.  It says

7    you did well in school.  You, I think, intend to continue

8    your education, and I believe that.

9         And you have a lady in Mexico, who I believe, with

10   the children generated from that relationship, provide you

11   an incentive to better yourself and stay in Mexico with

12   the lady and four children.  You can do that.  And, given

13   the 1 year of state parole that you still face, I think a

14   -- which is not even recommended, a supervised release

15   sentence would be inappropriate.

16        So, the sentence will be within the guideline

17   range.  And I have found that the 2018 guidelines are the

18   applicable guidelines here.

19        In considering and entering my rulings on the

20   objections, I have found that the offense level here is

21   19, with a Criminal History Category Level of V, yielding

22   a guideline range of 57 to 71 months.  A sentence within

23   that range, as I have said, is appropriate.  I find no

24   reason to -- I think the supervised release range is 1 to

25   3 years.  What is the fine range now?

1          PROBATION OFFICER:  $10,000 to $100,000, Your

2     Honor.

3          THE COURT:  10,000 to 100,000.  Okay, that is the

4     guideline range.  And the supervised release range is 1 to

5     3 years.

6          I find no reason to depart or vary from the

7     advisory guideline range, and the difference between the

8     maximum and minimum in the guideline range does not exceed

9     24 months, and I will impose a sentence within that

10    advisory guideline range.

11         Pursuant to the Sentencing Reform Act of 1984, it

12    is the Judgment of the Court that the defendant, Deivy

13    Romero-Lopez, is hereby committed to the custody of the

14    Bureau of Prisons to be imprisoned for a term of 57

15    months, to run -- is this consecutive or concurrent with

16    the state?

17         MR. BELCHER:  The presentence report is

18    recommending concurrent, and I would agree with that

19    recommendation.

20         THE COURT:  Okay.  We will do it that way.

21    Judgment here shall run concurrently to Adams County

22    District Court Case No. 17-cr-1930 and El Paso County Case

23    No. 18-cr-93.  This is a further reflection of the history

24    that Mr. Romero brings here today.  I will not impose a

25    term of supervised release.

1          I advise you, sir, that you have the right to

2    appeal my sentence, which is done by filing a Notice of

3    Appeal with the Clerk of this Court within 14 days after

4    the entry of Judgment or you lose that right of appeal.

5          You do have a continued right to court-appointed

6    counsel for that purpose.  If you were to request it, the

7    Clerk of the Court must immediately prepare and file a

8    Notice of Appeal on your behalf.

9          I think, Ms. Mills, I have addressed everything?

10          PROBATION OFFICER:  Yes, I believe so, Your Honor.

11          THE COURT:  Okay.  Anything further from the

12    Government?

13          MR. MCINTYRE:  No, Your Honor.  Thank you.

14          THE COURT:  Mr. Belcher?

15          MR. BELCHER:  Yes, Your Honor.  Just in the event

16    that Mr. Romero-Lopez does appeal the sentence, I would

17    note our objection to the sentence being imposed as

18    greater than necessary under 3553(a).

19          THE COURT:  Thank you.

20          The sentence that I impose here I find and conclude

21    is sufficient, but not greater than necessary, to comply

22    with the purposes set forth in 18 U.S.C. Section 3553(a).

23          MR. BELCHER:  Your Honor, Mr. Lopez wants me to

24    also point out on his behalf, you mentioned his aliases.

25    Most of those aliases listed in there are his name; Davie

1      Romero-Lopez, Deivy Lopez, Deivy Romerolopez, all in

2      different forms, that were written by the jail that

3      processed him.  And he just wanted me to note for the

4      Court that he used his real name and his Mexican ID card

5      in this offense and the DWAI offense and any of the other

6      stuff while he is here.  He wants the Court to know that.

7              THE COURT:  Okay.  I appreciate that.

8              Well, Mr. Romero, I think you have a future if you

9      just make it for yourself.  I think you can do it.  Okay.

10             COURTROOM DEPUTY:  Your Honor?

11             THE COURT:  No fine.

12             COURTROOM DEPUTY:  Would you like to address the

13     special assessment fee?

14             THE COURT:  Say that again?

15             COURTROOM DEPUTY:  Would you like to address the

16     special assessment fee?

17             THE COURT:  Yes.  It is a hundred dollars.  I will

18     impose that, and order that it is due and payable

19     immediately.

20             Thank you, Emily.  Appreciate that.

21             Anything else from anybody else here in the

22     courtroom?

23             All right.  We will be in recess.

24             Thank you, and defendant is remanded.

25             (Proceedings conclude at 9:42 a.m.)

1

2              **R E P O R T E R ' S   C E R T I F I C A T E**

3

4         I, Darlene M. Martinez, Official Certified

5    Shorthand Reporter for the United States District Court,

6    District of Colorado, do hereby certify that the foregoing

7    is a true and accurate transcript of the proceedings had

8    as taken stenographically by me at the time and place

9    aforementioned.

10

11        Dated this <u>21st</u> day of <u>August</u>, 2019.

12

13        _____

14        s/Darlene M. Martinez

15        RMR, CRR

16

17

18

19

20

21

22

23

24

25