APPEAL,INTERPRETER,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: <u>1:18–cr–00096–LTB</u>–1

Case title: USA v. Romero–Lopez

Date Filed: 02/22/2018
Date Terminated: 07/24/2019

Assigned to: Judge Lewis T. Babcock

Appeals court case number: 19–1268 Tenth Circuit

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **Deivy Romero–Lopez** | represented by | **Matthew Kyle Belcher** |
| *TERMINATED: 07/24/2019* | | Office of the Federal Public Defender–Denver |
| *also known as* | | 633 Seventeenth Street |
| Davie Romero–Lopez | | Suite 1000 |
| *TERMINATED: 07/24/2019* | | Denver, CO 80202 |
| *also known as* | | 303–294–7002 |
| Jonathan Aria–Ramirez | | Fax: 303–294–1192 |
| *TERMINATED: 07/24/2019* | | Email: <u>Matthew_Belcher@fd.org</u> |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Public Defender or Community Defender Appointment* |

**<u>Pending Counts</u>**

8 U.S.C. § 1326(a), (b)(1) Illegal Re–entry After Deportation (1)

**<u>Disposition</u>**

57 months imprisonment, to run concurrent to sentence imposed in Adams County District Court, Case Number 17CR1930 and El Paso County District Court, Case Number 18CR93. $100 special assessment fee.

**<u>Highest Offense Level (Opening)</u>**

Felony

**<u>Terminated Counts</u>**

None

**<u>Disposition</u>**

**<u>Highest Offense Level (Terminated)</u>**

None

**<u>Complaints</u>**

**<u>Disposition</u>**

None

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Daniel Robert McIntyre** |
| | | U.S. Attorney's Office–Denver |
| | | 1801 California Street |
| | | Suite 1600 |
| | | Denver, CO 80202 |
| | | 303–454–0100 |
| | | Email: daniel.mcintyre@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Federal Agency Attorney* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/22/2018 | 1 | 6 | INDICTMENT as to Deivy Romero–Lopez (1) count(s) 1. (Attachments: # 1 Criminal Information Sheet) (angar, ) (Entered: 02/22/2018) |
| 02/22/2018 | 2 | | Arrest Warrant Issued in case as to Deivy Romero–Lopez. (angar, ) (angar, ) (Entered: 02/22/2018) |
| 02/22/2018 | 3 | | RESTRICTED DOCUMENT – Level 4: as to Deivy Romero–Lopez. (angar, ) (Entered: 02/22/2018) |
| 01/10/2019 | 4 | | MOTION for Writ of Habeas Corpus ad Prosequendum by USA as to Deivy Romero–Lopez. (Attachments: # 1 Proposed Order (PDF Only), # 2 Proposed Document)(McIntyre, Daniel) (Entered: 01/10/2019) |
| 01/11/2019 | 5 | | ORDER for Writ of Habeas Corpus Ad Prosequendum as to Deivy Romero–Lopez (1), by Judge Lewis T. Babcock on 1/11/2019. (angar, ) (Entered: 01/11/2019) |
| 01/11/2019 | 6 | | Writ of Habeas Corpus ad Prosequendum Issued as to Deivy Romero–Lopez (angar, ) (Entered: 01/11/2019) |
| 01/23/2019 | 7 | | Arrest of Deivy Romero–Lopez. Initial Appearance set for 1/23/2019 02:00 PM in Courtroom C205 before Magistrate Judge N. Reid Neureiter. Spanish Interpreter Requested. (Text Only entry)(jgonz, ) (Entered: 01/23/2019) |
| 01/23/2019 | 8 | | MINUTE ENTRY for proceedings held before Magistrate Judge N. Reid Neureiter: Initial Appearance, Arraignment, Discovery, and Detention Hearing as to Deivy Romero–Lopez held on 1/23/2019. Defendant present in custody. Defendant advised. Court appoints counsel. Discovery memorandum executed. Plea of NOT GUILTY entered by defendant. Government seeking detention. Defendant is not contesting detention. Defendant ordered detained. Defendant remanded. Counsel is directed to chambers. (Total time: 7 minutes, Hearing time: 2:25 – 2:32 p.m.)<br><br>**APPEARANCES**: Greg Holloway on behalf of the Government, David Johnson on behalf of the defendant, Angela Ledesma on behalf of probation. FTR: Courtroom C205. Interpreter: Susana Cahill. (slibi, ) Text Only Entry |

| | | | |
|---|---|---|---|
| | | | (Entered: 01/23/2019) |
| 01/23/2019 | 9 | | ORDER APPOINTING COUNSEL as to Deivy Romero–Lopez by Magistrate Judge N. Reid Neureiter on 1/23/2019. Text Only Entry (slibi, ) (Entered: 01/23/2019) |
| 01/23/2019 | 10 | | NOTICE OF ATTORNEY APPEARANCE: Matthew Kyle Belcher appearing for Deivy Romero–LopezAttorney Matthew Kyle Belcher added to party Deivy Romero–Lopez(pty:dft) (Belcher, Matthew) (Entered: 01/23/2019) |
| 01/23/2019 | 11 | | CJA 23 Financial Affidavit by Deivy Romero–Lopez. (slibi, ) (Entered: 01/23/2019) |
| 01/23/2019 | 12 | | Discovery Conference Memorandum and ORDER: Estimated Trial Time – under 5 days as to Deivy Romero–Lopez by Magistrate Judge N. Reid Neureiter on 1/23/2019. (slibi, ) (Entered: 01/23/2019) |
| 01/23/2019 | 14 | | Writ of Habeas Corpus ad Prosequendum Returned Executed as to Deivy Romero–Lopez on 1/23/19. (nmarb, ) Modified on 1/28/2019 to DISREGARD – filed in incorrect case. (nmarb, ). (Entered: 01/25/2019) |
| 01/24/2019 | 13 | | ORDER OF DETENTION as to Deivy Romero–Lopez by Magistrate Judge N. Reid Neureiter on 1/24/2019. (slibi, ) (Entered: 01/24/2019) |
| 02/05/2019 | 16 | | MINUTE ORDER as to Deivy Romero–Lopez: Status/Scheduling Hearing set for 2/13/2019 09:00 AM in Courtroom C401 before Judge Lewis T. Babcock, by Judge Lewis T. Babcock on 2/5/2019. (ebuch) (Entered: 02/05/2019) |
| 02/11/2019 | 17 | | NOTICE of Disposition by Deivy Romero–Lopez (Belcher, Matthew) (Entered: 02/11/2019) |
| 02/12/2019 | 18 | | MINUTE ORDER as to Deivy Romero–Lopez: Counsel shall contact chambers to set a change of plea hearing. The Status/Scheduling Hearing set for 2/13/2019 is vacated, by Judge Lewis T. Babcock on 2/12/2019. (ebuch) (Entered: 02/12/2019) |
| 02/19/2019 | 19 | | MINUTE ORDER as to Deivy Romero–Lopez: Change of Plea Hearing set for 3/19/2019 10:00 AM in Courtroom C401 before Judge Lewis T. Babcock, by Judge Lewis T. Babcock on 2/19/2019. (ebuch) (Entered: 02/19/2019) |
| 03/12/2019 | 20 | | Unopposed MOTION to Continue *Change of Plea Hearing* by Deivy Romero–Lopez. (Belcher, Matthew) (Entered: 03/12/2019) |
| 03/14/2019 | 21 | | MINUTE ORDER as to Deivy Romero–Lopez granting 20 Defendant's Unopposed Motion to Reset Change of Plea Hearing. Change of Plea Hearing reset for 4/5/2019 09:00 AM in Courtroom C401 before Judge Lewis T. Babcock, by Judge Lewis T. Babcock on 3/14/2019. (ebuch) (Entered: 03/14/2019) |
| 04/05/2019 | 22 | | COURTROOM MINUTES for Change of Plea Hearing as to Deivy Romero–Lopez held before Judge Lewis T. Babcock on 4/5/2019. Counsel shall brief the issue of whether the November 2015 or the November 2016 sentencing guidelines manual applies. Defendant pleads guilty to Count 1 of the Indictment. Sentencing set for 7/3/2019 09:00 AM in Courtroom C401 before Judge Lewis T. Babcock. Defendant remanded. Court Reporter: Mary George. Interpreter: Cathy Bahr. (ebuch) (Entered: 04/05/2019) |

| 04/05/2019 | 23 | 9 | PLEA AGREEMENT as to Deivy Romero–Lopez. (Attachments: # 1 Spanish Plea Agreement) (ebuch) (Entered: 04/05/2019) |
|---|---|---|---|
| 04/05/2019 | 24 | | STATEMENT IN ADVANCE OF PLEA OF GUILTY by Defendant Deivy Romero–Lopez. (Attachments: # 1 Spanish Statement in Advance of Plea of Guilty) (ebuch) (Entered: 04/05/2019) |
| 04/09/2019 | 25 | | MINUTE ORDER as to Deivy Romero–Lopez: Sentencing Hearing is set 7/3/2019 at 9:00 AM in Courtroom C401 before Judge Lewis T. Babcock, by Judge Lewis T. Babcock on 4/9/2019. (ebuch) (Entered: 04/09/2019) |
| 05/29/2019 | 26 | | RESTRICTED PRESENTENCE REPORT first disclosure for attorney review as to Deivy Romero–Lopez (Attachments: # 1 Exhibit A)(doden, ) (Entered: 05/29/2019) |
| 06/12/2019 | 27 | 26 | OBJECTION/RESPONSE to Presentence Report by Deivy Romero–Lopez (Attachments: # 1 Attachment 1, # 2 Attachment 2, # 3 Attachment 3, # 4 Attachment 4, # 5 Attachment 5)(Belcher, Matthew) (Entered: 06/12/2019) |
| 06/24/2019 | 28 | | RESTRICTED PRESENTENCE REPORT as to Deivy Romero–Lopez (Attachments: # 1 Exhibit A)(doden, ) (Entered: 06/24/2019) |
| 06/24/2019 | 29 | | RESTRICTED ADDENDUM to Presentence Report 28 as to Deivy Romero–Lopez (doden, ) (Entered: 06/24/2019) |
| 06/25/2019 | 30 | 79 | Objection *to the Addendum to the Presentence Report* by Deivy Romero–Lopez (Belcher, Matthew) (Entered: 06/25/2019) |
| 06/25/2019 | 31 | | RESTRICTED SECOND ADDENDUM to Presentence Report 28 as to Deivy Romero–Lopez (doden, ) (Entered: 06/25/2019) |
| 06/26/2019 | 32 | 83 | RESPONSE by USA as to Deivy Romero–Lopez re: 27 Objection/Response to Presentence Report filed by Deivy Romero–Lopez (McIntyre, Daniel) (Entered: 06/26/2019) |
| 07/02/2019 | 33 | | MINUTE ORDER as to Deivy Romero–Lopez: Sentencing set 7/3/2019 is vacated and reset for 7/19/2019 09:00 AM in Courtroom C401 before Judge Lewis T. Babcock, by Judge Lewis T. Babcock on 7/2/2019. (ebuch) (Entered: 07/02/2019) |
| 07/19/2019 | 34 | | COURTROOM MINUTES for Sentencing as to Deivy Romero–Lopez held before Judge Lewis T. Babcock on 7/19/2019. Defendant's Oral Motion for a Variant Sentence is denied. Defendant sentenced as reflected on the record. Court Reporter: Darlene Martinez. Interpreter: Ellen Klaver. (ebuch) (Entered: 07/19/2019) |
| 07/24/2019 | 35 | 89 | JUDGMENT as to defendant 1. Deivy Romero–Lopez. Count 1: 57 months imprisonment, to run concurrent to sentence imposed in Adams County District Court, Case Number 17CR1930 and El Paso County District Court, Case Number 18CR93. $100 special assessment fee, by Judge Lewis T. Babcock on 7/24/2019. (ebuch) (Entered: 07/24/2019) |
| 07/24/2019 | 36 | | STATEMENT OF REASONS as to Deivy Romero–Lopez. (ebuch) (Entered: 07/24/2019) |
| 07/24/2019 | 37 | 93 | NOTICE OF APPEAL as to 35 Judgment,, Terminate Criminal Case, by Deivy Romero–Lopez. (Belcher, Matthew) (Entered: 07/24/2019) |

| 07/25/2019 | 38 | | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 37 Notice of Appeal as to Deivy Romero–Lopez to the U.S. Court of Appeals. ( FPD,) (Attachments: # 1 Preliminary Record and Docket Sheet)(angar, ) (Entered: 07/25/2019) |
|---|---|---|---|
| 07/25/2019 | 39 | | USCA Case Number as to Deivy Romero–Lopez 19–1268 for 37 Notice of Appeal filed by Deivy Romero–Lopez. (angar, ) (Entered: 08/01/2019) |
| 08/08/2019 | 40 | | DESIGNATION OF RECORD ON APPEAL re 37 Notice of Appeal by Deivy Romero–Lopez. (Attachments: # 1 Criminal Docket)(Lee, Josh) (Entered: 08/08/2019) |
| 08/08/2019 | 41 | | TRANSCRIPT ORDER FORM re 37 Notice of Appeal by Deivy Romero–Lopez. (Attachments: # 1 Copy–Authorization for Payment of Transcript)(Lee, Josh) (Entered: 08/08/2019) |
| 08/08/2019 | 42 | | TRANSCRIPT ORDER FORM re 37 Notice of Appeal by Deivy Romero–Lopez. (Attachments: # 1 Copy–Authorization for Payment of Transcript)(Lee, Josh) (Entered: 08/08/2019) |
| 08/21/2019 | 43 | | TRANSCRIPT of Sentencing Hearing as to Deivy Romero–Lopez held on 7/19/19 before Judge Babcock. Pages: 1–28. <br>**<br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (dmart, ) (Entered: 08/21/2019) |
| 08/21/2019 | 44 | | REPORTER TRANSCRIPT ORDER FORM filed by Mary George re 37 Notice of Appeal. Transcript due by 9/16/2019. (nrich) (Entered: 08/21/2019) |
| 08/21/2019 | 45 | | REPORTER TRANSCRIPT ORDER FORM filed by Darlene Martinez re 37 Notice of Appeal. Transcript due by 9/15/2019. (nrich) (Entered: 08/21/2019) |
| 09/25/2019 | 46 | | TRANSCRIPT of Change of Plea as to Deivy Romero–Lopez held on April 5, 2019 before Judge Babcock. Pages: 1–20. <br>**<br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 09/25/2019) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No.   **18-cr-00096-LTB**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DEIVY ROMERO-LOPEZ
      *a/k/a Davie Romero-Lopez*
      *a/k/a Jonathan Aria-Ramirez*

      Defendant.

---

## INDICTMENT
### 8 U.S.C. § 1326(a), (b)(1)
### Illegal Re-entry After Deportation

---

The Grand Jury charges:

## <u>COUNT 1</u>

On or about January 3, 2018, in the State and District of Colorado, the defendant, DEIVY ROMERO-LOPEZ, *a/k/a Davie Romero-Lopez, a/k/a Jonathan Aria-Ramirez*, an alien, was found in the United States after having been denied admission, excluded, deported, and removed from the United States on or about July 6, 2013, and without the express consent of the proper legal authority to reapply for admission to the United States. All in violation of Title 8, United States Code, Section 1326(a).

## NOTICE OF ENHANCED PENALTY

The defendant is subject to the enhanced penalty under Title 8, United States Code, Section 1326(b)(1) because his denial of admission, exclusion, deportation and removal was subsequent to a conviction for a felony offense.


A TRUE BILL


Ink signature on file in Clerk's Office
FOREPERSON


ROBERT C. TROYER
United States Attorney


By: *s/ Daniel R. McIntyre*
Daniel R. McIntyre
Special Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0403
E-mail: Daniel.McIntyre@usdoj.gov
Attorney for the United States

DEFENDANT:                    **DEIVY ROMERO-LOPEZ**
                              *a/k/a Davie Romero-Lopez*
                              *a/k/a Jonathan Aria-Ramirez*

YOB:                          1990

ADDRESS:                      El Paso County Custody

COMPLAINT FILED?                        _____ YES          __X__ NO

        IF YES, PROVIDE MAGISTRATE CASE NUMBER:


HAS DEFENDANT BEEN ARRESTED ON COMPLAINT? _____ YES   __X__ NO

OFFENSE:   8 U.S.C. § 1326(a); (b)(1); Illegal re-entry of removed alien
           subsequent to an aggravated felony conviction

LOCATION OF OFFENSE:          El Paso County, Colorado

PENALTY:                      NMT 10 years imprisonment; NMT $250,000 fine, or both;
                              NMT three years supervised release;
                              $100 special assessment.

AGENT:                        Omar Lawton, Deportation Officer, ICE/DHS

AUTHORIZED BY:                Daniel R. McIntyre, Special Assistant U.S. Attorney

ESTIMATED TIME OF TRIAL:

  _X_ five days or less       ____ over five days        ____ other


THE GOVERNMENT:

  __X__ **will** seek detention in this case based on 18 U.S.C. § 3142(f)(2)

  _____ will not seek detention

The statutory presumption of detention **is not** applicable to this defendant.


OCDEF CASE:                   _____Yes          __X__ No

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.   18-cr-00096-LTB

UNITED STATES OF AMERICA,

Plaintiff,

v.

DEIVY ROMERO-LOPEZ

Defendant.

---

## PLEA AGREEMENT

---

The United States of America, by and through Jason R. Dunn, United States Attorney for the District of Colorado, and Daniel McIntyre, Special Assistant United States Attorney, and the defendant, DEIVY ROMERO-LOPEZ, personally and by counsel, Matthew Belcher, Assistant Public Defender, hereby submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I.   AGREEMENT

#### A.   Defendant's Plea of Guilty:

The defendant agrees to plead guilty to the sole count of the Indictment, charging a violation of 8 U.S.C. § 1326(a) and (b)(1), illegal re-entry of a previously deported alien following a felony conviction.

#### B.   Government's Obligations:

In exchange for the defendant's plea of guilty, the United States agrees to recommend the Court give the defendant full credit for acceptance of responsibility,

COURT EXHIBIT
1
9

unless the defendant engages in conduct that qualifies for the obstruction of justice enhancement under U.S.S.G. §§ 3C1.1 and 3E1.1, comment (note 4) between the time of the guilty plea and sentencing.

## II.  ELEMENTS OF THE OFFENSE

The parties agree that the elements of the offense to which the defendant will plead guilty are as follows:

*First*:  The defendant was an alien (not a citizen or national of the United States) at the time alleged in the indictment;

*Second*: the defendant had previously been deported and removed from the United States;

*Third*: the defendant knowingly entered and was found in the United States;

*Fourth*: the defendant had not received the consent of the proper legal authority to reapply for admission to the United States.

Note: The defendant acknowledges that he was convicted of a felony prior to his removal from the United States.  This is not an essential element of the offense, but rather is a sentencing factor for the Court.  *See Almendarez-Torres v. United States*, 523 U.S. 224, 235 (1998).

## III.  STATUTORY PENALTIES

The maximum statutory penalty for a violation of 8 U.S.C. § 1326(a) and (b)(1) is not more than 10 years of imprisonment; not more than a $250,000 fine, or both; not more than 3 years supervised release; and a $100 special assessment fee.  If a term of probation or supervised release is imposed, any violation of the terms and/or conditions

2

of supervision may result in an additional term of imprisonment.

## IV.  **COLLATERAL CONSEQUENCES**

This felony conviction may cause the loss of civil rights including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.  If the defendant is an alien, the conviction may cause the defendant to be deported and removed from the United States, to be denied admission to the United States, and to be denied citizenship.

## V.  **STIPULATION OF FACTS**

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement.   That basis is set forth below.   Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations.   To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate and agree as follows:   The defendant is a native and citizen of Mexico without claim to lawful immigration status in the United States.   The defendant

3

has been removed from the United States on August 28, 2010, August 30, 2011 and July

6, 2013. The defendant did not seek or obtain permission to return lawfully to the United

States. In other words, the defendant did not obtain the express consent of the proper

legal authority to reapply for admission to the United States. Nonetheless, he returned.

Immigration officials encountered the defendant in the District of Colorado on January 3,

2018.

With respect to his criminal history, the defendant has sustained the following

felony conviction prior to his removal:

- On August 25, 2011, in the District Court for Denver County, Colorado, the defendant was convicted for the offense of Possession of a Controlled Substance – Over 4 grams.

- On June 26, 2013, in the U.S. District Court for the District of Colorado, the defendant was convicted of Illegal Re-entry of a Removed Alien, for which he was sentenced to time served. 13-cr-00135-LTB.

## VI. ADVISORY GUIDELINE COMPUTATION AND 18 U.S.C. § 3553 ADVISEMENT

The parties understand that the United States Sentencing Guidelines are only

advisory, but represent the starting point and benchmark for sentencing. The parties

understand that the imposition of a sentence in this matter is governed by 18 U.S.C. §

3553. In determining the particular sentence to be imposed, the Court is required to

consider seven factors. One of those factors is the sentencing range computed by the

Court under advisory guidelines issued by the United States Sentencing Commission.

To aid the Court in this regard, the parties set forth below their estimate of the advisory

guideline range called for by the United States Sentencing Guidelines (USSG). To the

4

extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The parties disagree on the applicable guideline calculation in this case. The defendant believes that the November 2015 guideline manual applies. The government believes that the November 2016 guideline manual applies. Both calculations are set out below.

<u>The defendant's guideline calculation using the November 2015 guideline manual is as follows</u>:

A.  The base offense level is **8**

B.  Specific offense characteristics: **4-level** increase because the defendant was convicted of a felony prior to being deported from the United States

C.  There are no victim-related, role-in-offense, obstruction and/or multiple count adjustments.

D.  The Adjusted offense level therefore would be **12**

E.  The defendant should receive a **2 level** adjustment for acceptance of responsibility. The resulting total offense level therefore would be **10.**

F.  The parties believe the defendant's criminal history category is **V.**

G.  Assuming the criminal history facts known to the parties are correct, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

H.  The advisory guideline range of imprisonment resulting from an offense level of **10** and the above criminal history category is **21-27** months. However, in order to be as accurate as possible, with the criminal history

category undetermined at this time, the offense level estimated above could

conceivably result in a range from 6 to 30 months.

The government's guideline calculation using the November 2016 guideline manual is as follows:

A.     The base offense level is **8**.

B.     Specific offense characteristics: There is an **14-level** increase because the

defendant has previously been 1) convicted of Illegal R-entry. § U.S.S.G. 2L1.2(b)(1)(A),

and 2) convicted of a felony offense based on conduct occurring after his first order of

removal, for which the sentence imposed was five years.   § U.S.S.G. 2L1.2(b)(3)(A).

C.     There are no victim-related, role-in-offense, obstruction and/or multiple

count adjustments.

D.     The adjusted offense level therefore would be **22**.

E.     The defendant should receive a 3-level adjustment for acceptance of

responsibility under § 3E1.1.   The resulting, total offense level therefore would be **19**.

F.     The parties understand that the defendant's criminal history computation is

tentative.   The criminal history category is determined by the Court based on the

defendant's prior convictions.   Based on information currently available to the parties, it

is estimated that the defendant's Criminal History Category would be **V**.

G.     Assuming the criminal history facts known to the parties are correct, the

career offender/criminal livelihood/armed career criminal adjustments would not apply.

H.     Imprisonment:  The advisory guideline range of imprisonment resulting

from an offense level of **19** and the above criminal history category is **57-71** months.

However, in order to be as accurate as possible, with the criminal history category

6

undetermined at this time, the offense level estimated above could conceivably result in a range from 30 to 78 months.

  I. <u>Fine</u>: Pursuant to guideline § 5E1.2, assuming an estimated offense level of 19, the fine range for this offense would be $10,000 to $100,000, plus applicable interest and penalties. The fine range for an offense level 10 would be $4,000 to $40,000.

  J. <u>Supervised Release</u>: The guideline range of supervised release under § 5D1.2 is at least one year but not more than three years.

  The parties understand that although the Court will consider the parties' guideline estimate, the Court must make its own determination of the applicable guideline range. In doing so, the Court is not bound by the position of any party. The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. <u>ENTIRE AGREEMENT</u>

  This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not

7

expressly stated in this agreement.

Date: _4/5/2019_      _____
            Deivy Romero-Lopez
            Defendant

Date: _4/5/2019_      _____
            Matthew Belcher
            Attorney for the Defendant

Date: _4/5/19_       _____
            Daniel McIntyre
            Special Assistant United States Attorney

8

## EN EL TRIBUNAL FEDERAL DE PRIMERA INSTANCIA DE EEUU
## DEL DISTRITO DE COLORADO

**Causa penal no. 18-cr-00096-LTB**

**ESTADOS UNIDOS DE NORTEAMÉRICA,**

**Parte demandante,**

**c.**

**DEIVY ROMERO-LÓPEZ,**

**El acusado.**

---

### CONVENIO DECLARATORIO

---

La Fiscalía de Estados Unidos, por y mediante el Lic. Jason R. Dunn, Fiscal federal del Distrito de Colorado, y el Lic. Daniel McIntyre, Fiscal federal especial delegado, y el acusado, DEIVY ROMERO LÓPEZ, personalmente y mediante su abogado, el Lic. Matthew Belcher, Defensor público federal delegado, por la presente presentan para constar el presente Convenio Declaratorio a continuación, en conformidad con D.C.COLO.LCrR 11.1.

### I. **EL CONVENIO**

**A.** *Declaración de culpabilidad del acusado*:

El acusado se compromete a declararse culpable ante la única cuenta de la Acusación formal que imputa quebrantamiento del Título 8, del U.S.C. (Código Penal de EEUU) § 1326(a) y (b)(1), reentrada ilegal de un indocumentado deportado anteriormente, después de ser condenado por un delito mayor.

**COURT EXHIBIT 1(A)** 17

**B.**     **Obligaciones de la Fiscalía federal:**

A cambio de su declaración de culpabilidad del acusado, la Fiscalía Federal acepta (1) recomendar al Juzgado que al acusado le conceda la rebaja completa por aceptar su responsabilidad a menos que el acusado cometa un acto que llene los requisitos para un aumento por estorbo de justicia bajo Las Pautas Federales de las Penas (Las 'USSG', sus siglas en inglés) §§ 3C1.1 y 3E1.1, comentario (nota 4), el acto cometido entre su declaración de culpabilidad y la imposición de sentencia.

## II. <u>LOS ELEMENTOS DEL DELITO</u>

Las partes están de acuerdo en que los elementos del delito del cuál el acusado se declarará culpable son los siguientes:

*Primero:*     El acusado era indocumentado (que no era ciudadano ni nacional de Estados Unidos) en la fecha en cuestión según la acusación formal;

*Segundo:*     el acusado había sido deportado y expulsado anteriormente de los Estados Unidos;

*Tercero:*     el acusado a sabiendas volvió a entrar en y a él se le encontró en los Estados Unidos; *y*

*Cuarto:*     el acusado no había recibido consentimiento de las debidas autoridades legales para volver a solicitar su ingreso legal a los Estados Unidos.

Ojo:   El acusado reconoce haber sido él condenado por un delito mayor antes de su expulsión de los Estados Unidos.  Éste no es un elemento esencial del delito sino un factor para tomar en cuenta el Juzgado cuando dicte la sentencia. *Véase Almendarez-Torres v. United States,* 523 U.S. 224, 235 (1998).

### III. PENALIDADES LEGALES

La pena máxima por quebrantamiento del 8 U.S.C. § 1326(a) y (b)(1) es de

hasta un máximo de 10 años de prisión; una multa máxima de hasta $250,000.00, o

ambas cosas; y no más de tres (3) años de libertad vigilada/supervisada; y un

gravamen especial de $100.00. Si al acusado se le impone un plazo de probatoria o de

libertad supervisada, quebrantamiento de cualquiera de las condiciones de la

supervisión podrá tener como consecuencia una pena adicional de prisión.

### IV. CONSECUENCIAS ADICIONALES

La condena por este delito mayor podrá ocasionar la pérdida de los derechos

civiles incluyendo, pero no limitados a: el derecho de tener un arma de fuego; de votar;

de desempeñar un cargo público; y de servir como miembro de un jurado en un juicio.

Si el acusado es indocumentado, el resultado puede ser que él quede o deportado o

expulsado de los Estados Unidos, o en el futuro le podrán denegar al acusado la

entrada en los Estados Unidos, o le podrán denegar también la ciudadanía de Estados

Unidos.

### V. ESTIPULACIÓN (ACUERDO) TOCANTE A LOS HECHOS

Las partes están de acuerdo que existe una base en los hechos para su

declaración de culpabilidad que hará el acusado conforme a este convenio declaratorio.

La base mencionada se expondrá a continuación. Ya que el Juzgado, como parte de

su metodología para determinar la condena que impondrá, tiene que calcular el rango

de penas según las pautas consultivas para el delito del cuál quedará condenado el

acusado, tomar en cuenta la conducta relevante, y tomar en cuenta los demás factores

que dispone el 18 U.S.C. §3553, y resulta que hechos adicionales también se podrán

incluir a continuación que puedan tener importancia en mencionadas consideraciones y cómputos. Si en algo las partes del convenio no estuvieran de acuerdo en cuanto a los hechos que se detallan a continuación, este acuerdo de los hechos identificaría los hechos discutidos a la hora de realizarse este convenio declaratorio.

Esta estipulación o acuerdo tocante a los hechos no impide que cualquiera de las partes de este punto en adelante le presente al Juzgado hechos adicionales con tal que éstos no contradigan los hechos ya acordados entre las partes y que tengan importancia en los cálculos del Juzgado en cuanto a las pautas, los otros factores de la ley del 18 U.S.C. § 3553, o en la decisión del Juez en general respecto a la sentencia.

Las partes están de acuerdo en cuanto a los siguientes hechos:

Que el acusado es ciudadano y natural de México sin el derecho de estar legalmente bajo las leyes de Inmigración en los Estados Unidos. Al acusado lo habían expulsado de los Estados Unidos en las fechas del 28 de agosto de 2010, el 30 de agosto de 2011, y el 6 de julio de 2013. El acusado no buscó ni obtuvo permiso para volver legalmente a los Estados Unidos. En otras palabras, él no buscó ni obtuvo el consentimiento explícito como para volver legalmente a Estados Unidos. No obstante, él volvió al país. Los oficiales de inmigración al acusado lo encontraron el 3 de enero de 2018 en el Distrito de Colorado.

Con respecto a sus antecedentes penales, resulta que el acusado ha quedado condenado del siguiente delito mayor antes de su expulsión:

- El 25 de agosto de 2011: en el Tribunal de Distrito del Condado de Denver, Colorado, el acusado quedó condenado por el delito de Posesión de una Sustancia Regulada—más de 4 gramos.

- El 26 de junio de 2013: en el Tribunal Federal del Distrito de Colorado, el acusado quedó condenado por el delito de Reentrada Ilegal de un Indocumentado Expulsado, por el cual se le impuso sentencia del tiempo cumplido (o sea, 'tiempo servido'). 13-cr-00135-LTB.

## VI. LOS CÁLCULOS DE LAS PAUTAS CONSULTIVAS Y AVISO DEL 18 U.S.C. DEL ARTÍCULO § 3553

Las partes comprenden que las Pautas Federales de las Penas de EEUU son de índole consultiva solamente aunque representan un punto de partida o de referencia para el Juzgado en lo que se refiere a la sentencia. Las partes entienden que la imposición de pena en este caso es regida por el 18 U.S.C. (Código Penal de EEUU), § 3553. Antes de determinar la pena en particular que se le haya de imponer, el Juzgado se verá obligado a tomar en cuenta siete factores, uno de ellos siendo el mismo rango de penas calculado por el Juzgado con base en las pautas consultivas expedidas por la Comisión de las Penas Impuestas en Sentencia de Estados Unidos. Con el fin de ayudarle al Juzgado en este respecto, las partes han incluído a continuación sus propios cálculos del rango de las pautas consultivas según las Pautas Federales de las Penas de Estados Unidos. Si en algún aspecto de los cálculos las partes no estuvieran

de acuerdo, los puntos discutidos se expondrían en la sección a continuación.

Las partes no están de acuerdo en cuanto a las pautas apropiadas para este caso porque el acusado cree que sería el Manual, edición de 2015, el apropiado para utilizar, pero la fiscalía cree que sería el manual, edición de 2016 la correcta. Los dos cálculos se exponen a continuación:

5

El cálculo del acusado, utilizando el manual de las pautas de noviembre de 2015 sigue a continuación:

A.  El nivel básico del delito es el **8.**

B.  Las siguientes características específicas del delito se aplican:

Se aplica un aumento de **4 puntos en el nivel** debido a que el acusado fue anteriormente condenado por un delito mayor antes de quedar deportado de los Estados Unidos.

C.  No hay aumentos por haber víctimas, por el papel jugado en el delito, por estorbo de justicia, o por haber más de un cargo.

D.  El nivel delictivo ajustado sería, por lo tanto, **12**.

E.  El acusado debe de recibir una reducción de **2 puntos en el nivel** de la tabla por aceptar su responsabilidad. El nivel delictivo total que resulta sería, por lo tanto, **10**.

F.  Las partes reconocen que el cálculo de la categoría de antecedentes penales del acusado es provisional.  La categoría se determina por el Juzgado con base en las condenas previas del acusado.  Con base en la información disponible actualmente, se calcula que su categoría de antecedentes penales es la **V.**

G.  Se supone que los hechos respecto a los antecedentes penales son correctos y por lo tanto no habrá más aumentos por reincidencia delictiva, por dedicación a la delincuencia, ni por uso de arma de fuego por parte de un delincuente reincidente.

H.    Prisión:  La escala de las pautas consultivas que resulta del nivel delictivo **10** y la categoría de antecedentes penales mencionada es de **21 a 27** meses.  Sin embargo, con el fin de sacar la mayor precisión posible y ya que la categoría de antecedentes penales no se ha determinado definitivamente todavía, el rango de penas que resulta del nivel delictivo calculado antes podría, teóricamente, oscilar desde 6 hasta de 30 meses.

El cálculo de la fiscalía utilizando el manual de las pautas en efecto desde noviembre de 2016 es lo siguiente:

A.    El nivel básico del delito es el **8.**

B.    Las siguientes características específicas del delito se aplican:

Se aplica un aumento de **14 puntos en el nivel** debido a que el acusado  fue anteriormente condenado por (1) un delito mayor de Reentrada Ilegal. § U.S.S.G. (Pautas Federales) 2L1.2(b)(1)(A), y (2) condenado de un delito mayor con base en su conducta ocurrida después de emitírsele la primera orden de expulsión y por la cual se le impuso sentencia de cinco años. § U.S.S.G. 2L1.2(b)(3)(A)

C.    No hay aumentos por haber víctimas, por el papel jugado en el delito, por estorbo de justicia, o por haber más de un cargo.

D.    El nivel delictivo ajustado sería, por lo tanto, **22**.

E.    El acusado debe recibir una reducción de 3 puntos en el nivel por aceptar su responsabilidad bajo  § 3E1.1.  El nivel delictivo total que resulta sería de **19.**

F.    Las partes reconocen que el cálculo de la categoría de antecedentes penales del acusado es provisional.  La categoría se determina por el Juzgado con base en las condenas previas del acusado.  Con base en la información disponible actualmente, se calcula que su categoría de antecedentes penales es la **V.**

7

G.      Se supone que los hechos respecto a los antecedentes penales son correctos y por lo tanto no habrá más aumentos por reincidencia delictiva, por dedicación a la delincuencia, ni por uso de arma de fuego por parte de un delincuente reincidente.

H.      <u>Prisión</u>:  La escala de las pautas consultivas que resulta utilizando el nivel delictivo total de **19** y la categoría de antecedentes penales mencionada es de **57 a 71** meses.  Sin embargo, con el fin de sacar la mayor precisión posible y ya que la categoría de antecedentes penales no se ha determinado definitivamente todavía, el rango de penas que resulta del nivel delictivo calculado antes podría, teóricamente, oscilar desde un mínimo de 30 meses hasta de 78 meses.

I.      <u>Multa</u>:  Según la pauta § 5E1.2, y suponiendo que el nivel calculado del delito es 18 o 19**,** entonces el rango de multas para este delito sería de $10,000 hasta de $100,000.00, mas intereses y sanciones aplicables.  La escala de multas en nivel 10 sería de $4,000 hasta de $40,000.00.

J.      <u>La Libertad Supervisada</u>:  Según la pauta § 5D1.2, el plazo de libertad supervisada es de un mínimo de un año hasta máximo de tres años.

Las partes comprenden que aunque el Juzgado tomará en cuenta el cálculo según las pautas sacado por las partes, el Juzgado tiene que tomar su propia determinación del rango aplicable de las pautas.  Al hacerlo, el Juzgado no está obligado a seguir las posturas de ninguna de las partes.  Las partes entienden que el Juzgado tiene la libertad, al tomar en cuenta debidamente y al aplicar todos los factores de la ley del 18 U.S.C. § 3553, de imponerle al acusado una pena razonable que en su opinión sea apropiada en el ejercicio de su autoridad y que mencionada pena puede

ser menos que lo que sale en las pautas consultivas (en cuanto a su duración o la forma), de la misma tabla de las pautas consultivas, o puede ser mayor que el rango de las pautas, inclusive hasta la pena máxima que permite la ley, sin importarle los cálculos ni las posturas de las partes tocante a los factores de la ley del 18 U.S.C. § 3553.

## VII.   LA TOTALIDAD DEL CONVENIO

Este documento incluye todo lo que se ha acordado entre las partes.  No hay otras promesas, acuerdos (ni <<acuerdos secretos>>), condiciones, entendimientos o garantías, ni explícitas ni implícitas.  Al cumplirse este convenio, ni la fiscalía ni el acusado han contado ni contarán con ninguna condición, promesa, término, ni garantía que no conste explícitamente por escrito en este Convenio Declaratorio.

Fecha: 4/5/2019

Deivy Romero-López
El Acusado

Fecha: 4/5/2019

Lic. Matthew Belcher
Abogada del acusado

Fecha: _____

Lic. Daniel McIntyre
Fiscal federal especial delegado

*Patrick O'Connor, U.S. Courts certified interpreter and FPD staff interpreter, do hereby attest that I have translated this plea agreement into Spanish to the best of my abilities and that it is a true and faithful reproduction of the original document.      4/3/2019*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 18-cr-00096-LTB

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DEIVY ROMERO-LOPEZ,

        Defendant.

_____

**DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT**
_____

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant, Deivy Romero-Lopez, by and through his attorney of record, Assistant Federal Public Defender Matthew K. Belcher, and hereby submits the following objections to the Presentence Report (PSR) filed with this Court on May 29, 2019.

**Objection No. 1:**

Mr. Romero-Lopez objects to paragraph 14 of the PSR.

Specifically, Mr. Romero-Lopez objects to Probation's use of the 2018 Guidelines Manual when evidence exists that: (1) Mr. Romero-Lopez returned and was found illegally in the United States on July 11, 2016; and (2) under the then operative 2015 Guidelines Manual, Mr. Romero-Lopez' range of punishment was three to three and one-half years less severe than it currently is under the 2018 Guidelines Manual.  As such, if the Court were to sentence Mr. Romero-Lopez under the current guidelines, such a sentence would be in violation of the *ex post facto* clause of the United States Constitution.

*Facts:*

On July 6, 2013, Mr. Romero-Lopez was removed from the United States through the Port of Entry in Eagle Pass, Texas.[1]  Subsequently, Mr. Romero-Lopez illegally reentered the United States.  While the discovery indicates that Mr. Romero-Lopez estimated that he illegally reentered in September of 2016,[2] it is clear that this estimation was mistaken.  It is clear because both the discovery and the PSR accurately reflect that Mr. Romero-Lopez was arrested by the Adams County Sheriff's Office on July 11, 2016.[3]  Because of this arrest, Mr. Romero-Lopez was booked and processed through the Adams County Sheriff's Office before being released to the Washington House Detox Center.[4]  During the booking process, Mr. Romero-Lopez provided his true name, true date of birth, and the address where he was living with his family in Thornton, Colorado.[5] Mr. Romero-Lopez verified his true name, date of birth, and nationality by providing the deputies with a Mexican ID card.[6]

After spending the night at the detox facility, Mr. Romero-Lopez was released and provided with a summons for his initial court appearance on September 19, 2016.  Mr. Romero-Lopez failed to appear at this court appearance and, accordingly, a Failure to Appear warrant was issued by the court.[7]  On May 27, 2017, Mr. Romero-Lopez was arrested on the outstanding Failure to Appear warrant and subsequently sentenced to a term of probation for the misdemeanor offense,

---

[1] PSR at paragraph 10.
[2] Which still predates the change in the guidelines, which occurred in November of 2016.
[3] PSR at paragraph 31.  Government's discovery at Bates #INV_00000025.
[4] See arrest report (Attachment 1).
[5] *Id.*
[6] *Id.*
[7] PSR at paragraph 31.

to run concurrent with a new felony conviction he sustained on May 24, 2017 for Felony Menacing Real/Simulated Weapon.[8]

For approximately six months, Mr. Romero-Lopez was on probation in Adams County prior to his arrest on January 3, 2018, in El Paso County, Colorado, for Manufacture of a Controlled Substance.[9]  On the same date of his arrest, immigration officials met with and interviewed Mr. Romero-Lopez.  Subsequently, Mr. Romero-Lopez was charged in federal court for the instant offense.[10]

*Law:*

The *Ex Post Facto* Clause[11] is violated when a defendant is sentenced under Guidelines promulgated after he commits criminal acts and the new version provides a higher sentencing range than the version in place at the time of the offense.[12]  Cognizant of this, the Commission included a provision in the Guidelines, U.S.S.G. § 1B1.11(b)(1), which instructs a sentencing court to use the Guidelines Manual in effect on the date the offense of conviction was committed *IF* the court determines that using the Guidelines Manual in effect on the date of sentencing would violate the *Ex Post Facto* Clause of the United States Constitution.

The "offense of conviction" here is Illegal Reentry of a Previously Removed Alien, in violation of 8 U.S.C. § 1326.  One commits an illegal reentry offense by: (1) being an alien who has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding; and (2) entered, attempted to enter,

---

[8] *Id.*
[9] PSR at paragraph 33.
[10] PSR at paragraph 8.
[11] U.S. Const. art. I, § 9, cl.3.
[12] *Peugh v. United States*, 569 U.S. 530 (2013).

or at any time was found in the United States.[13]  Furthermore, a defendant is "found" in the United States when the government knows, or could have known through the exercise of diligence typical of law enforcement, the following: (1) the defendant is a prior deportee; (2) the defendant is illegally present in the United States; and (3) the defendant's whereabouts.

*Argument:*

On July 11, 2016, Mr. Romero-Lopez was arrested by the Adams County Sheriff's Office. During this arrest, Mr. Romero-Lopez provided the deputies with a Mexican ID card which contained his true name and true date of birth.  Additionally, Mr. Romero-Lopez provided the deputies with his address and fingerprints.  After being booked and processed, Mr. Romero-Lopez was then taken to a detox facility for the night.  The next morning he was released and returned home.

While nothing in the discovery that has been provided by the government, to date, indicates that immigration officials were directly contacted by Adams County Sheriff's Office to inform them of Mr. Romero-Lopez's arrest, there is evidence to suggest that immigration, nevertheless, was notified of Mr. Romero-Lopez's arrest and, through the exercise of diligence typical of law enforcement, could have ascertained his whereabouts.

A.  <u>Priority Enforcement Program</u>:

On November 20, 2014, then Department of Homeland Security Secretary Jeh Johnson executed a memorandum creating the Priority Enforcement Program ("PEP").[14]  Among other things, PEP relied on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to the FBI for criminal background checks to determine whether that

---

[13] *United States v. Olivas-Perea*, 297 F.Supp.3d 1191, 1207 (D. New Mexico 2017).
[14] See Archived Content from DHS describing PEP (Attachment 2).

individual was a priority for removal. If they were, they would seek their transfer from state custody. If not, often times, they would simply request that the local jurisdiction inform ICE of when the individual would be released from their custody. The Department of Homeland Security described the program as follows:

> PEP begins at the state and local level when an individual is arrested and booked by a law enforcement officer for a criminal violation and his or her fingerprints are submitted to the FBI for criminal history and warrant checks. This same biometric data is also sent to U.S. Immigration and Customs Enforcement (ICE) so that ICE can determine whether the individual is a priority for removal, consistent with the DHS enforcement priorities described in former Secretary Johnson's November 20, 2014 Secure Communities memorandum. Under PEP, ICE will seek the transfer of a removable individual when that individual has been convicted of an offense listed under the DHS civil immigration enforcement priorities, has intentionally participated in an organized criminal gang to further the illegal activity of the gang, or poses a danger to national security.[15]

The Priority Enforcement Program was in effect from November 20, 2014, until January 25, 2017, when President Trump reinstated Secure Communities by Executive Order No. 13768, entitled *Enhancing Public Safety in the Interior of the United States*.[16] Secure Communities was an enforcement program that predated PEP, both of which, however, relied on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to identify illegal aliens in their custody.[17]

Accordingly, it appears that under either PEP or Secure Communities, once Mr. Romero-Lopez was arrested, processed, and his fingerprints ran, ICE would have received notice of Mr. Romero-Lopez's illegal presence. This notice would have been received by ICE through the Alien Criminal Response Information Management System (ACRIMe), which is an information

---

[15] *Id.*

[16] See description of Secure Communities from Department of Homeland Security website (Attachment 3).

[17] See Archived Content from DHS describing PEP (Attachment 2).

data system used by ICE to receive and respond to immigration status inquiries made by other agencies about individuals arrested, subject to background checks, or otherwise encountered by state or local agencies.[18]   A similar scenario occurred in *United States v. Barcenaz-De Paz*, 19-CR-00250-REB.[19]

Given this technology, which appears to have been in place at the time of Mr. Romero-Lopez's arrest on July 11, 2016, even if not directly contacted by Adams County Sheriff's Office, ICE had constructive knowledge of his illegal presence within the United States.  Adams County Sheriff's Office processed and booked Mr. Romero-Lopez prior to releasing him to the detox facility.  Part of this booking process was taking fingerprints from Mr. Romero-Lopez to run a background check through the FBI.  This background check, under PEP, would have sent the same biometric information to both the FBI and ICE.  As such, at the very least, Immigration had constructive knowledge of Mr. Romero-Lopez's presence in the United States.[20]

### B.  Exercise of Diligence Typical of Law Enforcement:

Once informed of Mr. Romero-Lopez's arrest, ICE would have easily been able to ascertain that he was a prior deportee illegally present in the United States.  That is because, here, Mr. Romero-Lopez provided law enforcement with his true name, true date of birth, actual address, and fingerprints. In addition, by exercising the diligence typical of law enforcement, ICE could have obtained his address from the Adams County Sheriff's Office and sent agents there to question and/or arrest Mr. Romero-Lopez the next day.  Failure to do so, whether it be due to resource constraints or based on the restraints placed on ICE by the Priority Enforcement Program,

---

[18] See Privacy Impact Assessment Update for ACRIMe (Attachment 4).
[19] See Report of Investigation, page INV_00000002, last sentence first paragraph (Attachment 5).
[20] *See e.g. United States v. Gomez*, 38 F.3d 1031 (8th Cir. 1994)

is of no consequence. If ICE was aware, or should have been aware of Mr. Romero-Lopez' presence, but chose not to act, they should be held to that choice when determining the appropriate guidelines range.[21]

*Conclusion:*

Mr. Romero-Lopez was found to have illegally reentered the United States when he was arrested by Adams County Sheriff's Office on July 11, 2016. At that time, the 2015 Guidelines Manual would have recommended a sentencing range for the instant offense of 21 to 27 months. However, as he currently sits, Mr. Romero-Lopez is facing an advisory range of 57 to 63 months. To sentence Mr. Romero under the 2018 Guidelines Manual, which was promulgated after he committed his criminal acts, and which provides a far greater sentencing range than the version in place at the time of the offense, would be a violation of the *Ex Post Facto* Clause to the United States Constitution.

**Objection No. 2:**

Mr. Romero-Lopez objects to paragraph 32 of the PSR.

Specifically, Mr. Romero-Lopez objects to Probation's assessment of three criminal history points for the August 28, 2018, revocation sentence of one-year with the Department of Corrections. Probation is correct that, under § 4A1.2(k), when faced with a sentence upon revocation, to determine criminal history points, one would add the original term of imprisonment to any term of imprisonment imposed upon that revocation. The problem is that Mr. Romero-Lopez did not receive a "sentence of imprisonment" when originally sentenced on August 4, 2017. While he did receive 90 days in jail, that jail sentence was fully suspended in lieu of three years of

---

[21] *United States v. Olivas-Perea*, 297 F.Supp.3d at 1210.

probation. And, under § 4A1.2(b), the term "sentence of imprisonment" does not include suspended sentences.

As such, Mr. Romero-Lopez should receive only two criminal history points for the sentence of imprisonment he sustained on August 28, 2018, as it was a sentence of greater than 60 days but less than one year and one month. In isolation, this would drop his total criminal history points to 13 instead of 14, but he would remain in criminal history category VI.

**Objection No. 3:**

Mr. Romero-Lopez objects to paragraph 36 of the PSR.

Specifically, Mr. Romero-Lopez objects to Probation's assessment of two additional criminal history points for his commission of the instant offense while under a criminal justice sentence for Adams County District Court, Case Number 17CR1930. As stated above, Mr. Romero-Lopez was found to have illegally returned to the United States on July 11, 2016, when he was arrested by Adams County Sheriff's Office for the misdemeanor offense of Driving While Ability Impaired. At that time, Mr. Romero-Lopez was not under a criminal justice sentence. And, as such, the two point criminal history enhancement cited by Probation in paragraph 36 of the PSR is not warranted. The offense cited by Probation in support of the assessment did not occur until almost 13 months after Mr. Romero-Lopez was found in the United States and, therefore, cannot be a basis for the § 4A1.1(d) enhancement.

In isolation, this would result in 12 criminal history points, not 14, and would place Mr. Romero-Lopez in criminal history category V, not criminal history category VI. In conjunction with the above objection, in total, Mr. Romero-Lopez would have 11 criminal history points, but remain in criminal history category V. In criminal history category V, using the

2015 Guidelines Manuel, Mr. Romero-Lopez's advisory guideline range would be 21 to 27 months.

**Objection No. 4:**

Mr. Romero-Lopez objects to Probation's recommendation, found on page R-1, that the Court impose a three-year term of supervised release.

First, pursuant to U.S.S.G. § 5D1.1(c), the Commission advises sentencing courts to forgo the imposition of a term of supervision when the defendant is a deportable alien who likely will be deported after imprisonment. The reason for this advice is two-fold: (1) unless the defendant returns legally, supervision is not necessary; and (2) if the defendant returns illegally, the need to afford adequate deterrence and protect the public is adequately served by a new prosecution.

Additionally, here, Mr. Romero-Lopez has, at a minimum, one year of parole that will follow his five-year sentence in the Colorado Department of Corrections. Given this, a concurrent term of federal supervision is unwarranted.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

/s/ Matthew K. Belcher
MATTHEW K. BELCHER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Matthew_Belcher@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2019, I electronically filed the foregoing ***Defendant's Objections to the Presentence Report*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Daniel Robert McIntyre, Assistant U.S. Attorney
Email: daniel.mcintyre@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Deivy Romero-Lopez
via mail

/s/ Cecilia Hernandez
Cecilia Hernandez, Legal Assistant
Office of the Federal Public Defender

10

# UNITED STATES v. ROMERO-LOPEZ

## Case No. 18-cr-00096-LTB

Attachment 1



# Incident/Investigation Report

**Agency:** ACSO  **Case Number:** 11CN16007302  **Date:** 03/04/2019 15:22:45

## Incident Information

| Date/Time Reported | Date/Time Found | Date/Time Found | Officer |
|---|---|---|---|
| 07/11/2016 00:17 | 07/11/2016 00:17 | 07/11/2016 00:17 | (AC9618) EHRHARDT, JASON |

**Incident Location**
W 72nd Ave / Clay St, Westminster, CO 80030

## Charges

### 1

| Charge Type | Description | Statute | UCR | |
|---|---|---|---|---|
| State | DRIVING UNDER THE INFLUENCE OF ALCOHOL | 42-4-1301(1)(A | 90D | ☐ Att ☑ Com |

| Alcohol, Drugs or Computers Used | Location Type | Premises Entered | Forced Entry | Weapons |
|---|---|---|---|---|
| ☑ Alcohol ☐ Drugs ☐ Computers | HIGHWAY/ROAD/ALLEY | | ☐ Yes ☑ No | 1. None |

| Entry | Exit | Criminal Activity | 2. |
|---|---|---|---|
| | | | 3. |

| Bias Motivation | Bias Target | Bias Circumstances | Hate Group |
|---|---|---|---|

### 2

| Charge Type | Description | Statute | UCR | |
|---|---|---|---|---|
| State | DUI PER SE | 42-4-1301(2)(a) | 90D | ☐ Att ☑ Com |

| Alcohol, Drugs or Computers Used | Location Type | Premises Entered | Forced Entry | Weapons |
|---|---|---|---|---|
| ☑ Alcohol ☐ Drugs ☐ Computers | HIGHWAY/ROAD/ALLEY | | ☐ Yes ☑ No | 1. None |

| Entry | Exit | Criminal Activity | 2. |
|---|---|---|---|
| | | | 3. |

| Bias Motivation | Bias Target | Bias Circumstances | Hate Group |
|---|---|---|---|

### 3

| Charge Type | Description | Statute | UCR | |
|---|---|---|---|---|
| State | DRIVER'S LICENSE - DRIVING W/OUT | 42-2-101(1) | 91A | ☐ Att ☑ Com |

| Alcohol, Drugs or Computers Used | Location Type | Premises Entered | Forced Entry | Weapons |
|---|---|---|---|---|
| ☑ Alcohol ☐ Drugs ☐ Computers | HIGHWAY/ROAD/ALLEY | | ☐ Yes ☑ No | 1. None |

| Entry | Exit | Criminal Activity | 2. |
|---|---|---|---|
| | | | 3. |

| Bias Motivation | Bias Target | Bias Circumstances | Hate Group |
|---|---|---|---|

### 4

| Charge Type | Description | Statute | UCR | |
|---|---|---|---|---|
| State | SPEEDING | 42-4-1101(1)(A | 91A | ☐ Att ☑ Com |

| Alcohol, Drugs or Computers Used | Location Type | Premises Entered | Forced Entry | Weapons |
|---|---|---|---|---|
| ☑ Alcohol ☐ Drugs ☐ Computers | HIGHWAY/ROAD/ALLEY | | ☐ Yes ☑ No | 1. None |

| Entry | Exit | Criminal Activity | 2. |
|---|---|---|---|
| | | | 3. |

| Bias Motivation | Bias Target | Bias Circumstances | Hate Group |
|---|---|---|---|



# Incident/Investigation Report

**Agency:** ACSO  **Case Number:** 11CN16007302  **Date:** 03/04/2019 15:22:45

## Victims

| Seq. # | Type | Injuries | | | Residency Status | | Ethnicity | |
|---|---|---|---|---|---|---|---|---|
| **1** | SOCIETY/ PUBLIC | None | | | Unknown | | Unknown | |

| Name(Last, First, M) | | Race | Sex | DOB | | Age |
|---|---|---|---|---|---|---|
| SOCIETY | | U | U | | | 00 |

| Address | | Home Phone |
|---|---|---|
| | | |

| Employer Name/Address | Business Phone |
|---|---|
| / | |

| Victim of Crimes | |
|---|---|
| 1,2,3,4 | |

## Offenders

| Seq. # | Type | Name(Last, First, M) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **1** | INDIVIDUAL | ROMERO-LOPEZ, DEIVY | | | | | | |

| AKA | | Race | Sex | DOB | Age | Height | Weight |
|---|---|---|---|---|---|---|---|
| | | W | M | 03/12/1990 | 26 | 5'09" | 170 lbs |

| Address | Home Phone |
|---|---|
| 475 RUSSELL BLVD APT. B-13, THORNTON, CO 80229 | |

| Employer Name/Address | Business Phone |
|---|---|
| / | |

| Scars, Marks, Tatoos or other distinguishing features |
|---|
| |

| Physical Characteristics |
|---|
| |

**Suspect Details**



# Incident/Investigation Report

**Agency:** ACSO          **Case Number:** 11CN16007302          **Date:** 03/04/2019 15:22:45

## Vehicles

| Seq. # | Year | Color | Style | Make | Model |
|--------|------|-------|-------|------|-------|
| 1 | 2008 | RED / RED | | JEEP | LIBERTY |

| VIN | License Plate Type | License / State | License Year | Owner |
|-----|-------------------|-----------------|--------------|-------|
| 1J8GN28KX8W278729 | TEMPORARY | 074093N / CO | 2016 | FIVE STARS AUTO SALES LLC |

| Status | Status Date | Value |
|--------|-------------|-------|
| INFORMATION ONLY | 07/11/2016 | |

**Vehicle Notes**

## Notes/Narratives

On 071116 at 0017 hours I was traveling westbound on 72nd Avenue from the 1800 block. At that time I was behind a red Jeep Liberty with Colorado temp tag #074093N. My dash mounted RADAR (unit #17) clocked the vehicle at a speed of 46 mph from the 1800 block until the 2600 block. The posted speed limit at the location is 30 mph. The vehicle also made a lane change at 72nd Avenue & Zuni without using a turn signal. I activated my emergency lights and the vehicle pulled over at 72nd Avenue & Clay St.

I contacted the driver of the vehicle, Daivy Romero-Lopez. I identified myself and advised him why he had been stopped. He spoke in broken English. Daivy could not provide a drivers license and only a Mexican ID card. As I was talking to Daivy I detected an odor of an alcoholic beverage on his breath, slurred speech and watery/bloodshot eyes. I asked him if he had been drinking and he replied that he had three beers. I asked him if he wanted to participate in voluntary roadside maneuvers and he agreed.

I asked him to exit his vehicle and he complied. I directed him to the rear of his vehicle. He swayed back and forth as he walked. I began voluntary roadside maneuvers at 0020 hours. Due to the slight language barrier he was only able to participate in the HGN maneuver. During that maneuver I observed six out of a possible six clues. At 0027 hours I placed him into custody for investigation of driving under the influence of alcohol. I advised him of the express consent law and he opted for a breath test. The vehicle was locked and left on scene per his request.

Daivy was transported to the substation. We arrived at 0046 hours. At 0113 hours I administered the intoxilyzer exam in accordance with all the rules and regulations. The result was a BrAC of .085 grams alcohol per 210 liters of breath. A clearance of Daivy stated that he did not have a valid drivers license. Daivy was issued a summons and notice of revocation. He was released to the Washington House Detox Center.

## Notes/Continuation



# Incident/Investigation Report

**Agency:** ACSO          **Case Number:** 11CN16007302          **Date:** 03/04/2019 15:22:45

| | | Fingerprinted | R84 Completed |
|---|---|---|---|
| **ARREST REPORT** | | [1] Yes | [1] Yes |
| | | [X] No | [2] No |

| 1 ORI # CO0010000 | 2 AGENCY NAME Adams County Sheriff's Office | 3a. ARREST # 2016006754 | 3b CASE # 11CN16007302 | 4 SFX |
|---|---|---|---|---|

| 5 LAST, FIRST, MIDDLE NAME Romero-lopez, Deivy | ILEADS ID 1609408 | 6 ALIAS AKA |
|---|---|---|

**IDENTIFICATION**

| 7 SEX [X]M [2]F | 8 RACE [X]W [2]B [3]A [4]I | 9 HGT. 5'09 | 10 WGT. 170-0 | 11 EYE BRO | 12 HAIR BRO | 13 SKIN | 14 | [1] SCARS | [2] MARKS | [3] TATTOOS | [4] AMPUTATIONS |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) Mexico | 16 SSN — — | 17 DATE OF BIRTH 03/12/1990 | 18 AGE 26 | 19 MISCELLANEOUS ID # |
|---|---|---|---|---|

| 20 SID # | 21 FINGERPRINT CLASS KEY MAJOR PRIMARY SCDV SUB-SECONDARY FINAL | 22 DL # | 23 ST CO |
|---|---|---|---|

| 24 FBI # | HENRY CLASS / NCIC CLASS | 25 IDENTIFICATION COMMENTS |
|---|---|---|

| 26 [1] RESIDENT [2] NON-RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) 475 Russell Blvd Apt B-13, Thornton, CO 80229 | 28 RESIDENCE PHONE | 29 OCCUPATION (BE SPECIFIC) |
|---|---|---|---|

| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) | 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) | 32 BUSINESS PHONE |
|---|---|---|

**ARREST**

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) W 72nd Ave / Clay St Westminster, Co 80030 | 34 SECTOR # | 35 ARRESTED FOR YOUR JURISDICTION? [X] IN STATE [ ] OUT STATE AGENCY [ ] YES [ ] NO |
|---|---|---|

| 36 CONDITION OF ARRESTEE: [1] DRUNK [3] SOBER [2] DRINKING [4] DRUGS | 37 RESIST ARREST? [1] YES [2] NO | 38 INJURIES? [1] NONE [2] OFFICER [3] ARRESTEE | 39 ARMED? [1] Y [X] N | 40 DESCRIPTION OF WEAPON |
|---|---|---|---|---|

| 41 DATE OF ARREST 07/11/2016 | 42 TIME OF ARREST 00:27 [1] 1. AM [2] 2. PM [X] MIL | 43 DAY OF ARREST [S][M][T][W][T][F][S] | 44 TYPE ARREST ON-VIEW CRIME & ARR AT SAME | 45 ARRESTED BEFORE? [1] YES [2] NO [ ] UNKNOWN |
|---|---|---|---|---|

| 46 CHARGE-1 [1] FEL [X] MISD Driving Under The Influence | 47 UCR CODE 90D | 50 STATE CODE/LOCAL ORD. 42-4-1301(1)(A) | 51 WARRANT # | DISPOSITION | 52 DATE ISSUED 01/12/2007 |
|---|---|---|---|---|---|
| 48 CHARGE-2 [1] FEL [X] MISD Dui Per Se | 49 UCR CODE 90D | 53 STATE CODE/LOCAL ORD. 42-4-1301(2)(a) | 54 WARRANT # | DISPOSITION | 55 DATE ISSUED 01/12/2007 |
| 56 CHARGE-3 [1] FEL [X] MISD Driver's License - Driving | 57 UCR CODE 91A | 60 STATE CODE/LOCAL ORD. 42-2-101(1) | 61 WARRANT # | DISPOSITION | 62 DATE ISSUED 01/12/2007 |
| 58 CHARGE-4 [1] FEL [2] MISD Speeding | 59 UCR CODE 91A | 63 STATE CODE/LOCAL ORD. 42-4-1101(1)(A) | 64 WARRANT # | DISPOSITION | 65 DATE ISSUED 01/12/2007 |

| 66 ARREST DISPOSITION Released On Summons - Adult | 68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME) |
|---|---|
| | 69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) |

**VEHICLE**

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO TOP BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|

| 78 VIN | 79 IMPOUNDED? [1] YES [2] NO | 80 STORAGE LOCATION/IMPOUND # |
|---|---|---|

| VEHICLE RELATED TO: | VEHICLE RELATION: |
|---|---|

| 81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED | [ ] CONTINUED IN NARRATIVE |
|---|---|

**JUVENILE**

| 82 JUVENILE DISPOSITION: [1] HANDLED AND RELEASED [3] REF. TO WELFARE AGENCY [5] REF. TO ADULT COURT [2] REF. TO JUVENILE COURT [4] REF. TO OTHER POLICE AGENCY | 83 RELEASED TO |
|---|---|

| 84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) | 85 ADDRESS (STREET, CITY, STATE, ZIP) | 86 PHONE |
|---|---|---|

| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | 90 PHONE |
|---|---|---|---|

**RELEASE**

| 91 DATE AND TIME OF RELEASE [1] AM [3] MIL [2] PM | 92 RELEASING OFFICER NAME | 93 AGENCY/DIVISION | 94 ID # |
|---|---|---|---|

| 95 RELEASED TO | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS |
|---|---|---|

| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE [1] YES [2] NO [3] PARTIAL | 99 PROPERTY NOT RELEASED/HELD AT: | 100 PROPERTY # |
|---|---|---|

| 101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) | LOCAL USE |
|---|---|

| 102 SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER | STATE USE |
|---|---|---|

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX | 110 ADDITIONAL CASES CLOSED NARRATIVE [ ] Y [ ] N |
|---|---|---|---|---|---|---|---|

| 111 ARRESTING OFFICER (LAST, FIRST, M.) Ehrhardt, Jason | 112 ID # AC9618 | 113 ARRESTING OFFICER (LAST, FIRST, M.) | 114 ID # | 115 SUPERVISOR Robbins ID # AC0320 | 116 WATCH CMDR. ID # |
|---|---|---|---|---|---|

| ADDITIONAL ARREST NARRATIVE CONTINUED | 117 DATE AND TIME OF ARREST | | | AM<br>PM<br>MIL | 118a. CASE # | 119 SFX |
|---|---|---|---|---|---|---|
| | 07/11/2016 | 00:27 | | | 11CN16007302 | |
| | | | | | 118b. ARREST #<br>2016006754 | |

120 ADDITIONAL ARREST INFORMATION

User: AHUNTER | Adams County Sheriff's Office | 03/04/2019 15:22:49

# Adams County Sheriff's Office DRIVE UNDER INFLUENCE/FIELD SOBRIETY INCIDENT REPORT

| DUI CASE # | INCIDENT CASE # | ARREST CASE # | TRAFFIC ACCIDENT CASE # | CITATION # | OFFENSE CLASSIFICATION | OFFICER OBSERVED SUBJECT DRIVING |
|---|---|---|---|---|---|---|
| 2016000345 | 11CN16007302 | 2016006754 | | | MISDEMEANOR | ☐ YES  ☒ NO |

| DRIVER: NAME (LAST, FIRST, MIDDLE) | RACE | SEX | HGT | EYE | HAIR | WGT | COMP | AGE | DOB | ETHNICITY | MARITAL STATUS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ROMERO-LOPEZ, DEIVY | W | M | 5'09" | BRO | BRO | 170 | | 26 | 03/12/1990 | H | U |

| HOME ADDRESS | CITY | STATE | ZIP | PHONE | OLN | SSN |
|---|---|---|---|---|---|---|
| 475 RUSSELL BLVD B-13 | THORNTON | CO | 80229 | - | CO 162020711 | - - |

| VEH TYPE | STYLE | VEH YEAR | VEH MAKE | VEH MODEL | VEH COLOR | LIC. PLATE NO | LIC. STATE | LIC. TYPE | VIN | IBR STATUS CODE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

## OBSERVATION

INITIAL DRIVING OBSERVATIONS BY REPORTING OFFICER:

| WEATHER | TRAFFIC CONDITIONS | LIGHTING CONDITIONS |
|---|---|---|
| NONE | LIGHT | DARK - LIGHTED |

| LOCATION OF ROADSIDES | DATE | TIME |
|---|---|---|
| 72ND & CLAY | 07/11/2016 | 00:22 |

| EYES | CLOTHING | ATTITUDE | COMPLEXION |
|---|---|---|---|
| BLOODSHOT/WATERY | | | |

| SPEECH | BREATH | INJURY/ILLNESS |
|---|---|---|
| SLURRED | STRONG ODOR | ☐ YES  ☒ NO |

| EVIDENCE SEIZED | ACCIDENT | PASSENGERS | |
|---|---|---|---|
| | NONE | ADULT: 1   JUVENILE: | ☐ INJURIES |
| | | ☒ WITH SUSPECT | ☐ OPEN CONTAINER |

## FIELD SOBRIETY TESTS

### HORIZONTAL GAZE NYSTAGMUS

☒ NONE   ☐ CONTACTS HARD   EQUAL TRACKING ☒ YES ☐ NO

☐ GLASSES   ☐ CONTACTS SOFT   EQUAL PUPILS ☒ YES ☐ NO

| LEFT | RIGHT | | NOT PERFORMED | STOPPED FOR SAFETY REASONS |
|---|---|---|---|---|
| ☒ | ☒ | EYE DOES NOT PURSUE SMOOTHLY | ☐ | ☐ |
| ☒ | ☒ | DISTINCT HGN AT MAX. DEVIATION | ☐ | ☐ |
| ☒ | ☒ | NYSTAGMUS ONSET BEFORE 45 DEGREES | ☐ | ☐ |

TOTAL SCORE (MAX SCORE 6): 6

### WALK AND TURN

☐ CAN NOT KEEP BALANCE

☐ STARTS TOO SOON

| | FIRST 9 STEPS | SECOND 9 STEPS |
|---|---|---|
| STOPS WHILE WALKING | | |
| MISSES HEEL-TOE | | |
| STEPS OFF THE LINE | | |
| RAISES ARMS | | |
| ACTUAL STEPS TAKEN | | |
| IMPROPER TURN | | |

☒ NOT PERFORMED

☐ STOPPED FOR SAFETY REASONS

TOTAL SCORE (MAX SCORE 8):

### ONE LEG STAND

| LEFT | RIGHT | | 0 - 10 SEC | 10 - 20 SEC | 20 - 30 SEC |
|---|---|---|---|---|---|
| ☐ | ☐ | | | | |
| SWAYS | | | | | |
| RAISES ARMS | | | | | |
| HOPS | | | | | |
| FOOT DOWN | | | | | |

☒ NOT PERFORMED

☐ STOPPED FOR SAFETY REASONS

TOTAL SCORE (MAX SCORE 4):

### OTHER ROADSIDES MANEUVERS

1.

2.

3.

4.

5.

## PBT TEST RESULTS

| CHEMICAL TEST OFFERED | IF UNABLE OR REFUSED, WHY? | | | | | |
|---|---|---|---|---|---|---|
| YES | | | | | | |

| BREATH TEST DATE | ANY ORAL CONSUMPTION BY DEF-20 MIN. PRIOR TO TEST | | TIME OF CONTACT | TIME AT STATION | TEST LOCATION | OPERATOR |
|---|---|---|---|---|---|---|
| 07/11/2016 | NO | | 00:17 | 00:46 | SHERIFF'S OFFICE | ARRESTING OFFICER |

| TIME OF FIRST TEST | RESULT | | TIME OF SECOND TEST | RESULT | | STANDARDS BY | DATE |
|---|---|---|---|---|---|---|---|
| 01:13 | .086 | ☐ %  ☒ BAC | 01:17 | 085 | ☐ %  ☒ BAC | | |

| BLOOD TEST DATE | TIME | RESULT | KIT # | TEST LOCATION | TEST RECORD# | BLOOD DRAWN BY | BLOOD SEALED BY |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| REPORTING OFFICER: | (AC9618) EHRHARDT, JASON | SIGNATURE: | DATE: |
|---|---|---|---|
| SUPERVISOR: | | SIGNATURE: | DATE: |

Page 1 of 2

User: AHUNTER     Adams County Sheriff's Office     03/04/2019 15:22:49

## Adams County Sheriff's Office DRIVE UNDER INFLUENCE/FIELD SOBRIETY INCIDENT REPORT

### MORE EVIDENCE SEIZED

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

### EXPLAIN IF UNABLE TO DO THE TEST - HORIZONTAL GAZE NYSTAGMUS OR ONE LEG STAND

SLIGHT LANGUAGE BARRIER

### EXPLAIN IF UNABLE TO DO THE TEST - WALK AND TURN

SLIGHT LANGUAGE BARRIER

### STATEMENTS AND NARRATIVE

STATEMENTS MADE BY DRIVER:

NARRATIVE:

HCN1800178?

DR 2576P (07/13/09)
**COLORADO DEPARTMENT OF REVENUE**
DIVISION OF MOTOR VEHICLES
DRIVER CONTROL/TRAFFIC RECORDS
DENVER CO 80261-0016
(303) 205-5613

# EXPRESS CONSENT AFFIDAVIT AND NOTICE OF REVOCATION
**YOU MUST ACT WITHIN 7 DAYS**
**THIS IS A LEGAL DOCUMENT**

Number _3185839_

*Date of Notice _071116_

| Respondent's Last Name | | First Name | | Middle Name | | Sex | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|---|
| Rompro Lopez | | Dairy | | — | | M | 5'9" | 170 | B.o | Lo |
| Date of Birth (MO/DY/YR) | Mailing address | | | | | | | | | |
| 031296 | 475 Russell Blvd B 13 | | | | | Thornton CO | | | 80279 | |
| Colorado PIN # or Other State's DL # | | Class | State | | CDL ☐ | CMV ☐ | HAZMAT ☐ | Accident ☐ Fatal ☐ | | |
| n/a | | | | | | | | | | |
| Plate # | Registered Owner's Name (last, first, middle) ☐ Same as above | | | | | | | Actual Physical Control | AM | |
| 074093N | Lakmoun | | | | | | | | PM | |

You are hereby notified that on this date, you were asked to submit to a test or tests to determine the alcohol and/or drug concentration within your system. [§42-4-1301.1, C.R.S.] The following constitute PROBABLE CAUSE to believe you were driving a motor vehicle while impaired by or under the influence of alcohol or drugs, or with a blood or breath alcohol content in excess of the limits imposed by law.

| At 0012 AM on 071116 (date) | On contact you had the following: | Voluntary roadside maneuvers | Chemical test chosen |
|---|---|---|---|
| you were operating a motor vehicle at: (location) 18th & 2500 w Land Air | **BREATH** ☐ Normal ☐ Odor of alcoholic | ☐ Yes ☐ No ☐ refused | ☐ blood ☐ breath |
| | **EYES** ☐ normal ☑ bloodshot ☐ glassy ☐ watery ☐ other | Satisfactorily completed as compared to a sober person ☐ Yes ☑ No | Time of test/blood draw AM PM |
| You were contacted for: speeding (reason for contact) | **SPEECH** ☐ normal ☐ slurred ☐ distinct ☐ other | Colorado Express Consent Law read or explained to respondent ☐ Yes ☐ No | on _____ Date of Stop 071116 |
| | **BALANCE** ☐ normal ☑ unsteady ☐ falling ☐ other | ☐ refused _____ (what did officer see or hear) | B.A.C. 085 |

## ORDER OF REVOCATION (§42-2-126 C.R.S.)

**THIS IS YOUR OFFICIAL ORDER.** Unless you make a written request for hearing, surrender your license, and receive a permit from the Department as explained below, this order takes effect on the eighth (8th) day following the Date of Notice*. This order remains in effect until you serve the period of revocation, comply with the provisions of §42-2-132 C.R.S., and complete the reinstatement process. Following reinstatement, you may have to pass a written and drive test before receiving a new driver's license.

[ ] **REFUSAL.** Because you refused to take or complete, or to cooperate with any testing or tests of your blood, breath, saliva, and/or urine, your driver's license and/or driving privilege is hereby revoked. (FIRST OFFENSE - one year, three years if hazardous material violation. SECOND OFFENSE - two years, life if commercial licensee. THIRD OR SUBSEQUENT OFFENSE - three years, life if commercial licensee.)

[ ] **EXCESS B.A.C.** Because you submitted to testing that disclosed an alcohol concentration of **0.08** or more, or **0.02** or more if you are under the age of 21, your driver's license or driving privilege is hereby revoked. (FIRST OFFENSE - nine months, three months if under 21 and B.A.C. is under 0.08, one year if commercial licensee. SECOND OFFENSE - one year, six months if under 21 and B.A.C. is under 0.08, life if commercial licensee. THIRD OR SUBSEQUENT OFFENSE - two years, life if commercial licensee.)

[ ] **COMMERCIAL VEHICLE AND/OR HAZARDOUS MATERIALS WITH EXCESS B.A.C.** Because you submitted to testing that disclosed an alcohol concentration of **0.04** or more, or at least **0.02** but less than **0.04** if you are under the age of 21, your driver's license and/or driving privilege is hereby revoked. (FIRST OFFENSE - one year, three years if hazardous material violation, three months if under 21 and B.A.C. is under 0.04. SECOND OFFENSE - life, six months if under 21 and B.A.C. is under 0.04 . THIRD OR SUBSEQUENT OFFENSE - life, one year if under 21 and B.A.C. is under 0.04).

**YOU HAVE THE RIGHT TO REQUEST A HEARING (§42-2-126(7) C.R.S.)** You must request a hearing in writing. If the department does not receive your written request by the first business day following the sixth (6th) calendar day from the Date of Notice*, you waive your right to hearing and this order is final. You may make your request for hearing in person at any Colorado Driver's License Office; **BRING THIS AFFIDAVIT AND NOTICE WITH YOU.** If you surrender a valid license either prior to or at the time of your written request, The Department may issue a temporary permit at that time; if issued, that permit is valid until your first scheduled hearing date. If the Department does not issue a temporary permit, this order takes effect on the eighth (8th) day following the Date of Notice* and your privilege is revoked pending final determination at hearing. **The hearing you request with the Department concerns only your driving privilege; it is not your court appearance.** Refer to the Uniform Summons and Complaint in your paperwork for instructions regarding your court appearance on criminal charges.

**SURRENDER OF DRIVER'S LICENSE** Section 42-2-126 (5)(b), C.R.S., requires the officer to take possession of any driver's license you hold. When you surrender your driver's license, the officer may issue a temporary permit that will remain in force for seven (7) calendar days after the Date of Notice*.

**TEMPORARY PERMIT** This entire notice and order is a temporary permit which expires on the seventh (7th) day after the Date of Notice* when indicated below and when signed by both you and the peace officer.

| License Surrendered? | Temporary Permit Issued? For Interlock restricted drivers, see also DR 2057- Do not issue permit. | | |
|---|---|---|---|
| ☐ Yes ☑ No | ☑ Yes ☐ No **Restrictions/Endorsements:** | | |
| Personally Served? (If blood do not serve) ☑ Yes ☐ No | Respondent's Signature (Officer, please explain a missing signature) | | |

I swear, verify, and affirm under penalty of perjury that the information and facts contained in this Affidavit and Notice of Revocation are true to the best of my knowledge and belief.

| Officer's Signature | Officer's Printed Name |
|---|---|
| | E.D. hard |

| Officer Number | Law Enforcement Agency (No Abbreviations, please) | County | District | Troop |
|---|---|---|---|---|
| 9618 | Adams County Sheriff | Adams | | |

(Original: Department of Revenue)          Read other side for information (Affidavit and Notice continues on back of form)

AGENCY

45

## INFORMATION CONCERNING COLORADO LAW

1. Any person who drives a motor vehicle in Colorado is deemed to have given express consent to a test of his/her breath or blood for the purpose of determining the alcohol content if a police officer has probable cause to believe a person has been driving a motor vehicle while under the influence of, or impaired by alcohol.

2. Any person who drives a motor vehicle in Colorado is deemed to have given express consent to submit to a test of his/her blood, saliva, and/or urine for the purpose of determining the drug content if a police officer has probable cause to believe a person has been driving a motor vehicle while under the influence of, or impaired by drugs.

3. You are not allowed to speak to an attorney prior to responding to the Officer's request for test(s).

4. If your lack of cooperation prevents the requested test(s) from being completed within two hours of your driving, you will be deemed to have refused testing.

5. A refusal to sign any release or consent form(s) required by a person authorized to take or withdraw specimens is a refusal to take the required test(s).

6. The result of the test(s) or your refusal to take the test(s) may be used in evidence against you in any proceedings on charges that have been or will be filed against you.

7. If you are under the age of 21 and this is a first revocation for at least 0.02 and your blood alcohol content was not greater than 0.05, you may be eligible to have the license revocation changed to a license suspension and to have a probationary driver's license after serving 30 days of the license revocation. To receive more information, contact the Hearing Section, Denver, CO 80261, (303) 205-5606.

8. If you are 21 or older and this is a nine-month revocation for having a B.A.C. of 0.08 or more in a non-commercial/HAZMAT vehicle, you may apply for early reinstatement of your driving privilege with an interlock restricted license after you serve one month under revocation. In order to qualify for early reinstatement, you must have an ignition interlock device installed on your vehicle. The requirement for the ignition interlock device and the interlock restriction will remain for a minimum of eight months. If your B.A.C. tested at or above 0.17, item #9 below also applies.

**For more information please go to www.revenue.state.co.us or call 303-205-5613.**

9. If your B.A.C. tested at or above 0.17 or if this is a second or subsequent offense, as a condition of license reinstatement you will be required to complete a Level II alcohol education and therapy program administered by a provider certified by the Division of Behavioral Health of the Colorado Department of Human Services. Also, for a period of at least two years, following reinstatement, your privilege to drive will be restricted to the operation of a motor vehicle equipped with an ignition interlock device.

# Intoxilyzer 9000 Evidential Breath Alcohol Test (EBAT) Test Report

Subject Name:
ROMERO-LOPEZ, DAIVY
DOB: 03/12/1990
Sex: Male
Driver License: NONE
State: CC
Zip Code: 80229

Location: ADAMS COUNTY
SHERIFF'S OFFICE

Serial Number: 90-900365
Test Number: 038916-004
Case Number: 110716137312
Date & Time of Offense: 07/11/2016 00:17

Intoxilyzer Operator:
EHRHARDT, JASON R
Last Certification Date: 02/29/2016
Agency: ADAMS COUNTY SHERIFF'S OFFICE

Arresting Officer:
EHRHARDT, JASON R
Agency: ADAMS COUNTY SHERIFF'S OFFICE
Crash: No     Injury: No

---

20-minute deprivation period     Start Time: 00:48     End Time: 01:11

- [x] The 20-minute deprivation period has been conducted at the certified EBAT facility by a certified EBAT instructor or operator that is in an active status.
- [x] The subject has removed any foreign material from the mouth cavity that is not permanent in nature, prior to starting the 20-minute deprivation period.

- [x] The subject has been deprived access to foreign material that may be introduced into the mouth cavity during the 20-minute deprivation period.
- [x] The subject has been observed for signs of belching, regurgitation, or intake of any foreign material into the mouth cavity during the 20-minute deprivation period.



| EBAT Test Sequence | g/210L | Time |
|---|---|---|
| Air Blank | 0.000 | 01:11:22 |
| Sim Temp | 33.9 C | |
| Wet Cal Chk | 0.097 | 01:11:48 |
| Air Blank | 0.000 | 01:12:28 |
| Subject Sample | 0.086 | 01:13:00 |
| Breath Volume | 2.73 Liters | |
| Air Blank | 0.000 | 01:13:44 |
| Diagnostics | Passed | 01:13:47 |
| Air Blank | 0.000 | 01:14:26 |
| Wait | | 01:16:29 |
| Air Blank | 0.000 | 01:17:06 |
| Subject Sample | 0.085 | 01:17:29 |
| Breath Volume | 2.62 Liters | |
| Air Blank | 0.000 | 01:18:12 |
| Sim Temp | 33.9 C | |
| Wet Cal Chk | 0.098 | 01:18:39 |
| Air Blank | 0.000 | 01:19:18 |

Final Result     0.085 g/210L



COMMENTS:

I am currently certified as an EBAT operator and attest that this Evidential Breath Alcohol Test (EBAT) has been performed in compliance (5CCR 1005-2) following the procedures set forth by the CDPHE.
I authenticate the information provided on this report is produced by the certified EBAT instrument used to perform this test.

07/11/2016

Certified EBAT Instructor or Operator Signature     Date

## UNIFORM SUMMONS & COMPLAINT OR PENALTY ASSESSMENT

NO. **SES0055412**

**ADAMS COUNTY SHERIFF'S OFFICE**

| THE PEOPLE OF THE STATE OF COLORADO VS: | | SSN: | | ROAD CODE | | | | CR #: 16-7302 | |
|---|---|---|---|---|---|---|---|---|---|

| Defendant (Last Name) | (First) | (Middle) | Date of Birth Mo. Day Yr. | Age | ( ) Traffic ( ) Penal | Violation Mo. Day Yr. |
|---|---|---|---|---|---|---|
| ROMERO-LOPEZ , DAIVY | | | 3/12/1990 | 26 | | 7/11/2016 |

| Defendant's Address | City | State | Zip Code | Direction of Travel | Approx. Time of Violation |
|---|---|---|---|---|---|
| 475 RUSSELL BLVD  Apt b-13 | *THORNTON | CO | 80229 | W | 00:17 |

| Driver's License Number and Type | | State | Race | Sex | Height | Weight | Hair | Eyes | Home Telephone | County | No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| N/A | ID | CO | W | M | 509 | 170 | BRO | BRO | | Adams | 12 |

| Employer Name | Employer Address | | Occupation | Business Telephone | Traffic Accident | Injuries Involved |
|---|---|---|---|---|---|---|
| | | | | | NO | NO |

| Vehicle License Number and Type | State | Veh. Year | Make | Type or Body Style | Approximate Location of Violation, State of Colorado | |
|---|---|---|---|---|---|---|
| 074093N | CO | 2008 | JEEP | SUV | On: | 1800-2600 W 72ND AVENUE |

| Vehicle Color (Top/Bottom) | VIN | | At Intersection with: | |
|---|---|---|---|---|
| RED | | 1J8GN28KX8W278729 | UNK | |

| YOU ARE SUMMONED AND ORDERED TO APPEAR TO ANSWER CHARGES AS STATED BELOW IN: | Registered Owner (Name and Address) NO Same as above; or | NO UNK |
|---|---|---|

ADAMS COUNTY COURT  AT: 1100 JUDICIAL CENTER DRIVE  IN: BRIGHTON, COLORADO 80601      On: **9/19/2016**      at: **08:30 AM**

| Offense: DRIVING UNDER THE INFLUENCE ALCOHOL | | | Common Code: 800 | |
|---|---|---|---|---|
| Code: 73281 | Statute Sect.: 42-4-1301(1)(A) | Sum | Points: 12 | |

| Offense: DUI PER SE | | | Common Code: 812 | |
|---|---|---|---|---|
| Code: 73124 | Statute Sect.: 42-4-1301(2)(A) | Sum | Points: 12 | |

| Offense: DRIVER'S LICENSE-DRIVING W/OUT | | | Common Code: 060 | |
|---|---|---|---|---|
| Code: 72011 | Statute Sect.: 42-2-101(1) | Sum | Points: 3 | |

| Offense: SPEEDING 10-19 OVER LIMIT | | | Common Code: 005 | |
|---|---|---|---|---|
| Code: 73103 | Statute Sect.: 42-4-1101(1) | Sum | Points: 4 | Actual Speed: 46 Posted Speed: 30 |

| PHOTOGRAPHED: | YES | FINGERPRINTED | CDL: | NO | CMCL VEH REQ CDL INVOLVED | | CMV USDOT # | | HAZ MAT | NO |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Fine $ | Sum | Total Surcharge $ | Sum | | DNA $ | NA | | TOTAL TO BE PAID BY MAIL $ | | Sum |
| **SUMMONS** | TRAFFIC INFRACTION ( X ) | | OFFENSE ( X ) | | | | | | | |

| Without admitting guilt, I promise to appear at the time and place indicated above.<br><br>DEFENDANT<br>NOTICE: SEE INSTRUCTIONS BELOW | My signature is a promise to pay this penalty assessment within 20 days. With payment I acknowledge guilt of all charges listed above and understand that the points indicated will be assessed against my driver's license. If I do not pay my signature is a promise to appear in court.<br><br>X X X X<br><br>DEFENDANT<br>NOTICE: SEE INSTRUCTIONS BELOW |
|---|---|

THE UNDERSIGNED HAS PROBABLE CAUSE TO BELIEVE THAT THE DEFENDANT COMMITTED THE OFFENSE(S) AGAINST THE PEACE AND DIGNITY OF THE PEOPLE OF THE STATE OF COLORADO AND AFFIRMS THAT A COPY OF THIS SUMMONS & COMPLAINT OR PENALTY ASSESSMENT WAS SERVED UPON THE DEFENDANT.

OFFICER PRINT LAST NAME  Ehrhardt

| DISTRICT | TROOP | PATROL | DATE ISSUED | MO. | DAY | YR. | No. | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | TAC24 | 07/11/2016 | | | | SES0055412 | OFFICER | BADGE NO  96-18 |



Date of Issuance: **07/11/2016**
Shift:
Car #:
EVENT: **\*NONE**
2nd Officer:
Stop Type: **TRAFFIC**
Accident: **NO**
Photo ID: **NO**
Towed: **No**
School Zone: **NO**
Const Zone Work Pres: **NO**
Traffic Conditions:
Weather Conditions:
Violator Attitude:
Road Conditions:
Immigration: **No**
Secondary Type:
Name of Secondary Type:
Secondary Address:
Bus City:
Bus State and Zip: **CO**
Void Reason:

**No. ES0055412**

CR #: **16-7302**

VES: **45**
Alleged Speed: **46 MPH**
Posted Speed: **30 MPH**
Distance:
Speed Determined By: **RADAR**
Method: **Hand Held**
Laser #: **3854**
Radar #: **17**
L/R Tested?: **Yes**
Fork #:
MPH:
Fork 2 #:
MPH:

**Officer Notes:**

**Picture**



**Fingerprint**

## Adams County Colorado
## Cash Receipt

| Customer Name | RIVKA MORGAN–SHERMAN |
| Customer Address | FEDERAL PUBLIC DEFENDER CASE REPORT REQUEST |
| Receipt Number | SR8341 |
| Receipt Date | 03/04/19 |
| Cashier ID | HUNTEA |
| Payment Method | Check/Money Order |
| Check Number | 2265 |
| Reference Number | 16–7302 |

**Adams County Sheriff's Office**

Records Section
4201 E. 72nd Avenue, Suite C
Commerce City, CO  80022

Sheriff's Administration Section
332 North 19th Avenue
Brighton, Colorado  80601

| Item Code | Description | Quantity | Rate | Extended Amount | Item Comment |
|---|---|---|---|---|---|
| SCH | Search Fee | 1 | 5.00 | 5.00 | |
| CR | Case Report | 4 | .25 | 1.00 | |
| | | | Receipt Total | 6.00 | |



SR8341

# UNITED STATES v. ROMERO-LOPEZ

## Case No. 18-cr-00096-LTB

Attachment 2

Official Website of the Department of Homeland Security

 **ICE**

Report Crimes: Email or Call 1-866-DHS-2-ICE

# Archived Content

In an effort to keep ICE.gov current, the archive contains content from a previous administration or is otherwise outdated. This information is archived and not reflective of current practice.

## Priority Enforcement Program

ERO

**Priority Enforcement Program (PEP) was U.S. Immigration and Customs Enforcement (ICE) program from 2015 to 2017. This content is now archived.** Read more about the program's history below.

The Department of Homeland Security's (DHS) Priority Enforcement Program (PEP) enables DHS to work with state and local law enforcement to take custody of individuals who pose a danger to public safety before those individuals are released into our communities. PEP was established at the direction of former DHS Secretary Jeh Johnson in a November 20, 2014 memorandum, entitled Secure Communities, that discontinued the Secure Communities program. PEP focuses on convicted criminals and others who pose a danger to public safety.

### How it works

PEP begins at the state and local level when an individual is arrested and booked by a law enforcement officer for a criminal violation and his or her fingerprints are submitted to the FBI for criminal history and warrant checks. This same biometric data is also sent to U.S. Immigration and Customs Enforcement (ICE) so that ICE can determine whether the individual is a priority for removal, consistent with the DHS enforcement priorities described in former Secretary Johnson's November 20, 2014 Secure Communities memorandum. Under PEP, ICE will seek the transfer of a removable individual when that individual has been convicted of an offense listed under the DHS civil immigration enforcement priorities, has intentionally participated in an organized criminal gang to further the illegal activity of the gang, or poses a danger to national security.

### What are DHS' priorities for removal?

PEP builds upon the enforcement priorities set forth in the November 20, 2014 Memorandum from former DHS Secretary Jeh Johnson entitled *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*.

### Forms

Under PEP, DHS does not use the Form I-247 (Immigration Detainer – Notice of Action) and instead uses two new forms:

- *Form I-247N, Request for Voluntary Notification of Release of Suspected Priority Alien:* The Form I-247N requests the receiving local law enforcement agency (LEA) notify ICE of the pending release from custody of a suspected priority removable individual at least 48 hours prior to release, if possible. The Form I-247N does not request or authorize the LEA to hold an individual beyond the point at which he or she would otherwise be released. Additionally, on the Form I-247N, ICE must identify the enforcement priority under which the individual falls.

- *Form I-247D, Immigration Detainer - Request for Voluntary Action:* The Form I-247D requests the receiving LEA maintain custody of the priority individual for a period not to exceed 48 hours beyond the time when he or she would have otherwise been released from custody. On this form, ICE must identify the enforcement priority under which the individual falls, as well as the basis for its determination of probable cause. The LEA must also serve a copy of the request on the individual in order for it to take effect.

- *Form I-247-X, Request for Voluntary Transfer:* This form is for enforcement priorities that do not fall under the Priority Enforcement Program (PEP). The Form I-247X requests the receiving LEA maintain custody of the priority individual for a period not to exceed 48 hours beyond the time when he or she would have otherwise been released from custody. The priority subcategories not covered by PEP, but for which ICE may otherwise seek transfer from cooperative jurisdictions are:

52

- 1(b) – Aliens apprehended while attempting to illegally enter the country

- 2(c) – Unlawfully present aliens who have not resided continuously in U.S. since January 1, 2014

- 2(d) – Aliens determined by an FRO to have significantly abused the visa or visa waiver programs

- 3 – Aliens issued final removal orders on or after January 1, 2014

Also, ICE may work with cooperating states or localities to arrange for the transfer of a removable individual whose removal has been determined by a senior ICE official to serve an important federal interest.

## Public Information

ICE's Enforcement and Removal Operations (ERO) is committed to a transparent process and to resolving concerns as promptly as possible. For this reason, concerns or questions regarding ICE practices, policies and/or programs should first be directed to the local field liaison. Stakeholders can reach out to their local field office through the ERO Contact page.

## How is PEP different from Secure Communities?

PEP focuses on targeting individuals convicted of significant criminal offenses or who otherwise pose a threat to public safety. Under prior policy, detainers could be issued when an immigration officer had reason to believe the individual was removable and fell within one or more enumerated priorities, which included immigration-related categories and having been convicted of or charged with certain crimes.

Under PEP, ICE will only seek transfer of individuals in state and local custody in specific, limited circumstances. ICE will only issue a detainer where an individual fits within DHS's narrower enforcement priorities and ICE has probable cause that the individual is removable. In many cases, rather than issue a detainer, ICE will instead request notification (at least 48 hours, if possible) of when an individual is to be released. ICE will use this time to determine whether there is probable cause to conclude that the individual is removable.

**Comparison of Secure Communities and Priority Enforcement Program**

| Secure Communities | Priority Enforcement Program |
|---|---|
| Relied on fingerprint based biometric data submitted during bookings by state and local law enforcement agencies to the FBI for criminal background checks. | Continues to rely on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to the FBI for criminal background checks. |
| Prior to December 21, 2012, the only policy limitations on detainer issuance were that: (1) a law enforcement agency (LEA) had exercised its independent authority to arrest the individual; and (2) the immigration officer had reason to believe that the individual was subject to ICE detention for removal or removal proceedings. Circumstances under which a detainer could be issued were narrowed by a December 12, 2012 policy memorandum, but still included individuals charged, but not yet convicted, of criminal offenses, in addition to individuals with no criminal history, such as individuals with final orders of removal from an immigration judge. Detainers could also be issued in circumstances in which ICE determined an individual posed a significant risk to national security, border security, or public safety. | A November 20, 2014 memorandum from DHS Secretary Jeh Johnson significantly narrows the category of individuals for whom DHS will seek transfer from LEA custody and prioritizes individuals who pose a threat to public safety. Under PEP, ICE will no longer seek transfer of individuals with civil immigration offenses alone, or those charged, but not convicted of criminal offenses. Instead, ICE will seek transfer where a removable individual has been convicted of specifically enumerated crimes, has intentionally participated in criminal gang activity, or poses a danger to national security. |
| Requested that LEAs detain an individual beyond his or her scheduled release date. | In many cases, ICE will simply request notification of when an individual who falls within the PEP priorities is to be released—rather than issue a request for detention beyond that point. Under PEP, detainers may only be issued in limited circumstances, when ICE indicates on the form that the individual is both a PEP enforcement priority and that there is probable cause to believe that the subject is removable (such as a final order of removal). |
| Detainer form **requested** that LEA provide a copy to the individual subject to the detainer. | Detainer form **requires** that LEA provide a copy to the individual subject to the detainer **in order for the request to be effective**. |
| Request to maintain custody was limited to 48 hours, excluding Saturdays, Sundays, and holidays. | Request to maintain custody is limited to 48 hours. Saturdays, Sundays, and holidays are no longer excluded. |

Case 1:18-cr-00096-LTS Document 47-1 Filed 10/16/19 USDC Colorado Page 54 of 94
Case 2:18-cr-00096-LTS Document 27-2 Filed 06/12/19 Page 4 of 4

6/10/2019                                    Priority Enforcement Program | ICE

| Secure Communities | Priority Enforcement Program |
|---|---|
| Basis for "reason to believe" the subject was removable, and therefore subject to a request for detention, was not disclosed on the detainer form. | Detainer form requires that the basis for "probable cause" that an individual is removable be indicated:<br>• final order of removal;<br>• pendency of removal proceedings;<br>• biometric match reflecting no lawful status or otherwise removable; or<br>• statements by the subject to an immigration officer and/or other reliable evidence. |
| Some ICE detainers were issued with respect to foreign-born individuals who did not have records or a biometric match in ICE databases without any other additional information. | ICE no longer issues detainers in cases of foreign-born individuals who do not have records or a biometric match in ICE databases, without any other additional information. Detainers must include an indication of probable cause and that the individual is an enforcement priority under PEP. |

View archived Secure Communities page →

## Related Information

### FAQs

- Relating to Executive Action on Immigration

- PDF Version

- PEP Brochure

- PEP Overview

Last Reviewed/Updated: 06/22/2017

# *UNITED STATES v. ROMERO-LOPEZ*

## Case No. 18-cr-00096-LTB

Attachment 3

Secure Communities | ICE

Official Website of the Department of Homeland Security

 **ICE**

Report Crimes: Email or Call 1-866-DHS-2-ICE

## Secure Communities

ERO

    Overview    FAQs

Share

- 
- 
- 
- 

The highest priority of any law enforcement agency is to protect the safety and security of the communities it serves.

**ICE prioritizes the removal of public safety and national security threats, those who have violated our nation's immigration laws, including those who have failed to comply with a final order of removal, and those who have engaged in fraud/willful misrepresentation in connection with official government matters.**

Secure Communities is a simple and common sense way to carry out ICE's enforcement priorities for those aliens detained in the custody of another law enforcement agency (LEA). It uses a federal information-sharing partnership between DHS and the Federal Bureau of Investigation (FBI) that helps to identify in-custody aliens without imposing new or additional requirements on state and local law enforcement. For decades, local jurisdictions have shared the fingerprints of individuals arrested and/or booked into custody with the FBI to see if those individuals have a criminal record and outstanding warrants. Under Secure Communities, the FBI automatically sends the fingerprints to DHS to check against its immigration databases. If these checks reveal that an individual is unlawfully present in the United States or otherwise removable, ICE takes enforcement action – prioritizing the removal of individuals who present the most significant threats to public safety as determined by the severity of their crime, their criminal history, and risk to public safety – as well as those who have violated the nation's immigration laws.

**The federal government, not the state or local law enforcement agency, determines what immigration enforcement action, if any, is appropriate.**

Only federal DHS officers make immigration enforcement decisions, and they do so only after an individual is arrested for a criminal violation of local, state, or federal law, separate and apart from any violations of immigration law.

## The Basics

ICE completed full implementation of Secure Communities to all 3,181 jurisdictions within 50 states, the District of Columbia, and five U.S. Territories on January 22, 2013. While the biometric interoperability has remained constant since full implementation was achieved, ICE's operational posture under Secure Communities was temporarily suspended by DHS policy from November 20, 2014, through January 25, 2017.

Since its reactivation on January 25, 2017 through the end of Fiscal Year (FY) 2017, as a result of Executive Order No. 13768, entitled *Enhancing Public Safety in the Interior of the United States*, more than 43,300 convicted criminal aliens have been removed as a result of Secure Communities.

## How Does Secure Communities Work?

Through the aforementioned Executive Order, DHS has been provided clear and common-sense priorities for immigration enforcement focused on the faithful execution of the immigration laws of the United States, as passed by the Congress. Secure Communities will utilize all available data systems and Criminal Alien Program resources to identify and take enforcement actions (to include the lodging of detainers) against criminal and other priority aliens while they are in the custody of another law enforcement or correctional agency. This will prevent their release back into the community, and thus stop the cycle of recidivism perpetrated by many of these criminal and immigration offenders.

Secure Communities had a long and successful history prior to its suspension as indicated above. In fact, from its inception in 2008 through FY14 and since its reactivation on January 25, 2017 through the end of FY 2017, Secure Communities interoperability led to the removal of

over 363,400 criminal aliens from the U.S.

Last Reviewed/Updated: 03/20/2018

# *UNITED STATES v. ROMERO-LOPEZ*

## Case No. 18-cr-00096-LTB

Attachment 4



**Privacy Impact Assessment Update**
**for the**

# Alien Criminal Response Information Management System (ACRIMe)

## DHS/ICE/PIA–020(b)

## January 24, 2013

**Contact Point**
**Gary Mead**
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**
**(202) 732-3100**

**Reviewing Official**
**Jonathan R. Cantor**
**Acting Chief Privacy Officer**
**Department of Homeland Security**
**(202) 343-1717**



# Abstract

The Alien Criminal Response Information Management System (ACRIMe) is an information system used by U.S. Immigration and Customs Enforcement (ICE) headquarters and field personnel to receive and respond to immigration status inquiries made by other agencies about individuals arrested, subject to background checks, or otherwise encountered by those agencies. The original ACRIMe Privacy Impact Assessment (PIA) was published on April 22, 2010, and was updated on September 29, 2010. ICE is updating the PIA again to address the following changes: (1) the current interoperability process, which compares biometrics submitted to the Federal Bureau of Investigation's (FBI) Integrated Automated Fingerprint Identification System (IAFIS)/Next Generation Identification (NGI) against the United States Visitor and Immigrant Status Indicator Technology Program's Automated Biometric Identification System (IDENT), has expanded to include additional agencies submitting biometric-based immigration status inquiries to ICE for additional purposes; (2) the fingerprints of alien registrants on the National Sex Offender Registry will be compared against IDENT to permit ICE to identify convicted alien sex offenders who are amenable to removal from the United States under the Immigration and Nationality Act; and (3) the ACRIMe Tipline Module is being retired.

# Overview

*Interoperability*

The original ACRIMe PIA described the "interoperability" process between IDENT and IAFIS/NGI used to support the ICE Secure Communities Program. Under interoperability, the fingerprints of individuals arrested by or in the custody of a criminal justice agency participating in the Secure Communities Program are sent to IAFIS/NGI for matching against the FBI's criminal fingerprint holdings. Through interoperability, the fingerprints are also checked against IDENT and, if there is a match in IDENT, the FBI generates an Immigration Alien Query (IAQ) that is sent to ACRIMe. An ICE employee uses ACRIMe to research the subject of the IAQ, determine the immigration status of the subject, and generate an Immigration Alien Response (IAR), which ACRIMe sends back to the FBI Criminal Justice Information Services (CJIS) Division. The FBI combines and sends the IDENT response and the IAR back to the agency that conducted the fingerprint check for awareness if they are technically capable of receiving the response. ACRIMe also sends the IAR to the appropriate ICE field office to determine the appropriate enforcement action, if any, to take against the individual.[1]

Since the original ACRIMe PIA was published, ACRIMe's use has been expanded to assist other agencies that use Department of Homeland Security (DHS)–Department of Justice

---

[1] For more information on the interoperability process, see DHS/ICE/PIA–020 Alien Criminal Response Information Management System (ACRIMe), April 22, 2010 (http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_ice_acrime.pdf), and DHS/NPPD/USVISIT/PIA-007 Biometric Interoperability between the U.S. Department of Homeland Security and the U.S. Department of Justice at http://www.dhs.gov/privacy-documents-us-visit.



**Homeland
Security**

(DOJ) Interoperability to screen individuals for various purposes, including administration of criminal justice, national security, and background checks/investigations conducted for employment, access, and other suitability purposes. The existing process is used for all the new uses. The agencies submit an individual's fingerprints in order to ascertain his or her immigration status. ICE receives an IAQ in ACRIMe if there is a match in IDENT and, using the process described above, ICE researches the individual and sends back a response. These other agencies use the information returned by ACRIMe, along with other information they collect, to help them with their activities. For example, the information provided by ACRIMe assists some agencies in vetting job applicants and determining their suitability for a particular job. The appendices to this PIA list the new uses of interoperability that ACRIMe now supports. The appendices will be updated as new interoperability users are added and as existing users change how they use interoperability. It should be noted that although ACRIMe is supporting new uses under interoperability, the process by which IAQs (queries) are submitted to ACRIMe and IARs (responses) are sent back to the FBI CJIS Division, and ultimately to the agency submitting the request, remains the same. The new interoperability uses described in the appendices to this PIA will also be addressed in a forthcoming IDENT PIA update.[2]

### National Sex Offender Registrants

Using interoperability, ICE will begin to screen convicted sex offenders whose fingerprints are captured during federal, state, local, and tribal law enforcement processes that enroll these individuals in sex offender registries. ICE places a high priority on targeting for removal those aliens with criminal records who pose a threat to public safety, such as sex offenders. When a convicted sex offender is released from incarceration, the individual is required to register as a sex offender with authorities in the state in which he or she resides. During the registration process, state authorities typically capture the individual's fingerprints and biographic information and transmit them to the FBI CJIS Division for inclusion in the National Sex Offender Registry,[3] and to update IAFIS and the individual's FBI criminal record. Via interoperability, the FBI CJIS Division automatically runs the individual's fingerprints against IDENT. If the fingerprints match fingerprints in IDENT, an IAQ is generated and sent to ACRIMe. ICE users research the immigration status of the individual and generate an IAR containing the results of that research in ACRIMe. The IAR is sent to the relevant ICE field office, which determines the appropriate enforcement action to take against the individual, if any. For example, if the IAR indicates the convicted sex offender is an alien who is now amenable to removal from the United States due to the conviction, the ICE field office will take appropriate

---

[2] For more information on the expanded uses of interoperability, see DHS/NPPD/USVISIT/PIA-007 Biometric Interoperability between the U.S. Department of Homeland Security and the U.S. Department of Justice and DHS/NPPD/USVISIT/PIA-002 Enumeration Services of the Automated Biometric Identification System (IDENT) at http://www.dhs.gov/privacy-documents-us-visit.

[3] The U.S. Government does not host or maintain information in the National Sex Offender Registry. Rather, such information is hosted by each jurisdiction. For more information, see the National Sex Offender Public Website at http://www.nsopw.gov/Core/Portal.aspx.

 **Homeland Security**

action in line with ICE's enforcement priorities to locate and arrest the alien and initiate a removal proceeding in U.S. Immigration Court. A similar process is used when there are changes to the convicted sex offender's information. The state authorities send the individual's information to the FBI CJIS Division. They update the person's record, run the individual's fingerprints against IDENT, and, if the fingerprints match fingerprints in IDENT, an IAQ is generated and sent to ACRIMe.

The processing of the convicted sex offender information varies from the standard interoperability process in one respect only: ACRIMe does not send a copy of the IAR to the FBI CJIS Division or to the agency that registered the sex offender. Instead, the IAR is only distributed and used within ICE for enforcement purposes.

*ACRIMe Tipline Module*

Previously, ICE recorded tips about suspicious activity or suspected illegal activity made by members of the public or by other criminal justice agencies in the ACRIMe Tipline Module.[4] This module is being retired and replaced by the FALCON Tipline (FALCON–TL) information system. The tips currently stored in the Tipline Module will be migrated to FALCON–TL.[5]

## Reason for the PIA Update

The PIA for ACRIMe was last updated September 29, 2010, and reflected the system at that time. ACRIMe's use has changed to better support interoperability and ICE's changing operational needs. ICE is updating this PIA to reflect those changes.

## Privacy Impact Analysis

### Authorities and Other Requirements

Authority for maintenance of the system is provided in § 504 of the Immigration and Nationality Act of 1990 (Public Law 101–649); 8 U.S.C. §§ 1103, 1324(b)(3), and 1360(b); the Brady Handgun Violence Prevention Act (Brady Act) of 1993, Public Law 103–159 (18 U.S.C. § 922(d)(5) and (g)(5)); FY 2008 Consolidated Appropriations Act (Public Law 110–161, 121 Statutes 1844 and 2050 (2007)); and the Immigration and Nationality Act (INA) provisions regarding removal of criminal aliens (INA §§ 237(a)(2) and 238).

The DHS/ICE–007 Law Enforcement Support Center (LESC) Alien Information Management (ACRIMe) System of Records Notice (SORN) applies to the ACRIMe

---

[4] For more information on the Tipline Module, see DHS/ICE/PIA-020 Alien Criminal Response Information Management System (ACRIMe), April 22, 2010 (http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_ice_acrime.pdf).

[5] For more information on FALCON–TL, see the DHS/ICE/PIA-033 FALCON Tipline (http://www.dhs.gov/sites/default/files/publications/privacy/PIAs/privacy_pia_ice_falcon%20tipline_november2012.pdf).



**Homeland
Security**

information.[6] This SORN is being updated concurrently with this PIA to: (1) add new categories of individuals not currently described in the existing SORN for new interoperability projects; (2) update the routine uses regarding how the data in the system is shared; and (3) update the retention period information for Brady Act check records in ACRIMe for biometric and biographic immigration status check records for National Sex Offender Registrants, and for individuals for whom non-criminal queries are conducted.

The ACRIMe SORN incorrectly stated that Brady Act check records are kept in ACRIMe for twenty-four (24) hours. The records are retained for five (5) years in order to provide ICE with sufficient time to follow up on any leads generated by Brady Act record check information. The ACRIMe PIA dated April 22, 2010, correctly listed the retention period as five (5) years. The SORN is being updated to reflect the correct retention period. Additionally, the SORN is being updated to reflect the retention period for biometric and biographic immigration status check records for National Sex Offender Registrants, and for individuals for whom non-criminal queries are conducted. There is more information about record retention below.

ACRIMe received its Authority to Operate in April 2010. The records retention schedule is being developed and will be sent to the National Archives and Records Administration for approval.

### Characterization of the Information

As noted above, by expanding the uses of interoperability, information about additional categories of individuals is now stored in ACRIMe. These categories of individuals and additional uses are discussed in detail in the appendices, and are also included in the update to the DHS/ICE–007 ACRIMe SORN published concurrently with this PIA. Additionally, ACRIMe will include information on aliens who are registered sex offenders. Even though the categories of individuals about whom ACRIMe has information are expanding, ACRIMe continues to capture the same types of information about these individuals. No new information is being captured.

Including information about new categories of individuals for whom ICE receives an IAQ in ACRIMe—national sex offender registrants and individuals submitted for screening by other agencies—presents a risk that the individuals in question are unaware that their data is being captured and processed by ICE, especially because ICE is not collecting this information directly from the individuals. This risk is mitigated by the general notice provided by publication of this PIA and the associated update to the DHS/ICE–007 ACRIMe SORN. It is also mitigated by the notices provided to the individuals by the agencies that are collecting this information on them. For example, agencies performing background checks on their personnel in order to make employment or suitability decisions provide notice to the individuals that a background check will be performed.

### Uses of the Information

---

[6] *See* http://www.dhs.gov/system-records-notices-sorns#6.



**Homeland
Security**

*Interoperability Users*

ACRIMe was first used with interoperability to determine the immigration status of aliens who were arrested by or in the custody of agencies in jurisdictions that participate in the Secure Communities Program. The use of interoperability and ACRIMe has now been expanded to support other agencies that submit fingerprints to the FBI CJIS Division for other purposes, such as the administration of criminal justice, national security, and background checks/investigations for employment, access, and other suitability purposes. As noted above, these other agencies use the information returned by ACRIMe, along with other information they collect to help them with their activities. For example, the information provided by ACRIMe assists some agencies in vetting job applicants and determining their suitability for a particular job. These new users and new programs are described in detail in the appendices to this PIA, which will continue to be updated as new interoperability projects supported by ACRIMe are added.

*National Sex Offender Registrants*

ICE is expanding the use of ACRIMe to support ICE's efforts to identify aliens who are convicted sex offenders. ICE receives an IAQ in ACRIMe and, after the ACRIMe user has researched the IAQ, an IAR is created in ACRIMe and shared only with the relevant ICE field office for them to take the appropriate enforcement or follow up action.

The expanded use of ACRIMe to include processing information on new categories of individuals poses the risk that ACRIMe is being used in a manner that is inconsistent with its intended purpose. This risk is mitigated by the fact that new interoperability users must go through a vetting process within DHS that considers the risk of mission creep and evaluates the consistency and compatibility of using the system for new populations of individuals. In addition, the inclusion of the convicted sex offenders and the new categories of individuals described in the appendices to this PIA is consistent with the purpose of ACRIMe and with one of the primary ICE missions, which is to identify aliens who are amenable to removal from the United States using both biometric and biographic-based queries submitted to ICE. Additionally, these new uses of ACRIMe are consistent with the law enforcement purpose of the system.

**Notice**

There are changes to the notice procedures. ICE is publishing an update to the DHS/ICE–007 ACRIMe SORN in the *Federal Register*, concurrent with the publication of this PIA. The SORN lists the updated categories of individuals contained in the system, additional routine uses for sharing the data in the system, and updates record retention information to correct the retention period for Brady Act check records, and to add the retention period for records about National Sex Offender Registrants and individuals for whom non-criminal queries are conducted. There is a potential risk that the general public is not aware of the existence of ACRIMe, and the possibility that information pertaining to a specific individual may exist in ACRIMe. The publication of the ACRIMe PIA, the subsequent PIA updates, and the ACRIMe SORN mitigate



**Homeland Security**

this risk by providing a detailed description of the types of individuals whose information is contained in the system, the types of data it contains, and how the data is used.

### Data Retention by the Project

There are three updates related to data retention in the DHS/ICE–007 ACRIMe SORN. First, the SORN is being corrected to state that Brady Act check records are being kept in ACRIMe for five (5) years in order to provide sufficient time to follow up on leads generated by the information. Second, the IAQ and IAR records pertaining to biometric and biographic immigration status checks for National Sex Offender Registrants will be maintained for seventy-five (75) years. Third, the IAQ and IAR records pertaining to non-criminal biometric and biographic immigration queries will be retained for thirty (30) years.

### Information Sharing

There are two changes in information sharing. First, ICE will return IARs for the agencies listed in the appendices that submit IAQs to ICE via the interoperability process. ICE continues to send IARs for these queries to the FBI CJIS Division, which in turn combines the IDENT response and the IAR and passes them to the originating agency, if technically capable. The originating agencies are restricted from further disseminating this information by the requirements in the Interoperability Memorandum of Understanding among DHS, DOJ, and the U.S. Department of State (DOS). The originating agencies are able to share the information only with other criminal justice agencies that are working with them on the given law enforcement activity. Second, the update to the DHS/ICE–007 ACRIMe SORN includes a number of new routine uses. These have been summarized below:

- To federal, state, local, tribal, territorial, or international agencies seeking to verify or ascertain the citizenship or immigration status of an individual for a purpose within the agency's jurisdiction;

- To a former employee of DHS for purposes of responding to an official inquiry or facilitating communications with a former employee that may be relevant for personnel-related or other official purposes;

- To prospective claimants and their attorneys for the purpose of negotiating the settlement of an actual or prospective claim against DHS prior to litigation or proceedings;

- To DOJ, FBI in order to facilitate responses to fingerprint-based immigration status queries;

- To federal, state, local, tribal, territorial, international, or foreign government agencies or entities to enable consultation to assist in the processing of redress requests;

- To federal, state, local, tribal, territorial, foreign, or international agencies regarding a requesting agency's decision concerning the hiring or retention of an individual, or if



the information is relevant and necessary to a DHS decision concerning hiring or retention;

- To federal, state, local, tribal, territorial, foreign, or international agencies, if DHS determines the information is relevant and necessary to the agency's decision concerning the hiring or retention of an individual and failure to disclose the information is likely to create a risk;

- To federal, state, local, tribal, territorial, foreign, or international agencies seeking information on the subjects of wants, warrants, or lookouts for law enforcement purposes;

- To federal, state, local, tribal, territorial, foreign government agencies or organizations, or international organizations lawfully engaged in collecting law enforcement intelligence;

- To foreign governments in order to notify them concerning an alien who is incapacitated, an unaccompanied minor, or deceased; and

- To federal, state, local, tribal, and territorial courts or government agencies involved in criminal investigation or prosecution, pretrial services, sentencing, parole, probation, or other aspects of the criminal justice process, and to counsel representing an individual in a proceeding, in order to ensure the integrity of the justice system by informing these recipients of the existence of an immigration detainer on that individual or that individual's status in removal proceedings, voluntary departure, or custodial status/location.

These changes in sharing do not introduce any new privacy risks. They are compatible with the law enforcement purposes for which the data is collected.

**Redress**

There are no changes to the individual access, redress, and correction procedures described in the ACRIMe PIA, the subsequent ACRIMe PIA updates, and the ACRIMe SORN. If it is discovered that information that was sent in an IAR was incorrect either due to an error or due to new information that is available about the individual, the IAR is amended and resent.

**Auditing and Accountability**

There are no changes that affect auditing or user accountability in ACRIMe. User access within the system continues to be controlled by user accounts, and users continue to take mandatory training, including privacy and security training. Additionally, recipients of the information in the IAR from ICE receive training to ensure that they know how to properly handle and protect the information.

If an agency requests to start submitting queries through interoperability to determine the immigration status of individuals, or if an agency wants to change the types of individuals it



**Privacy Impact Assessment Update**
ICE, ACRIME Interoperability and SOR Update
Page 9

submits as queries through interoperability, the agency must submit an application to the Interoperability New User Working Group, of which ICE is a member. The application explains the categories of individuals to be vetted and the reason why the agency wants to use interoperability for the vetting process. The working group considers the application and whether or not the proposed purpose is in line with the requirements in the Interoperability Memorandum of Understanding among DHS, DOJ, and DOS. Agencies whose applications are approved are allowed to submit queries under interoperability while those whose applications are denied are not.

## Responsible Official

Lyn Rahilly
Privacy Officer
U.S. Immigration and Customs Enforcement
Department of Homeland Security

## Approval Signature

Original signed and on file with the DHS Privacy Office.

_____

Jonathan R. Cantor
Acting Chief Privacy Officer
Department of Homeland Security



The following appendices contain brief descriptions of the agencies submitting queries through interoperability thus resulting in information about new categories of individuals being stored in ACRIMe.

### APPENDIX A

**Organization:**

DOJ, FBI Bioterrorism Risk Assessment Group (FBI/BRAG).

**Purpose and Use:**

FBI/BRAG's role is to enhance national security and public safety by providing the timely and accurate determination of an individual's eligibility to use, possess, or transfer select biological agents and toxins. Candidates are evaluated for access to select agents and toxins against criteria delineated in the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, and against prohibitive categories defining a restricted person in the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001. As part of the process used to assess candidates, BRAG submits individuals' fingerprints through interoperability in order to ascertain their immigration status. Fingerprints that match in IDENT generate IAQs that are sent to ACRIMe. ICE researches the individuals and sends IARs back to the FBI CJIS Division. The FBI CJIS Division then passes the information it receives from DHS to BRAG. BRAG uses this information, along with other information that it collects during the background check process, to determine whether or not the individuals should be able to possess, use, or transfer select biological agents and toxins.

**Individuals Impacted:**

Individuals who are candidates for access to select biological agents or toxins.

**Data Elements:**

ACRIMe may return various information to the FBI CJIS Division about the individual, which the FBI CJIS Division then passes on to FBI/BRAG:

- Name and aliases;
- Date and place of birth;
- Identifiers, including Alien Registration number and FBI number;
- ICE office controlling the alien's Alien File (File Control Office); and
- Information regarding the legal status of the individual.

Please see DHS/ICE/PIA–020 for a more complete discussion of the data elements contained in ACRIMe.



**Privacy Impact Assessment Update**
ICE, ACRIME Interoperability and SOR Update
Page 11

## APPENDIX B

### Organization:

DOS, Bureau of Diplomatic Security (DS), Security Infrastructure Directorate (SI), Office of Personnel Security and Suitability (PSS).

### Purpose and Use:

The mission of DOS/DS/SI/PSS is to screen DOS personnel to ensure that they can be granted access to classified information, and that they do not pose a risk to national security. DOS/DS/SI/PSS conducts background investigations for both applicants and current employees of the foreign and civil services, as well as for DOS contractors. DOS/DS/SI/PSS also assists regional security officers, who are responsible for conducting non-criminal investigations of individuals in the embassies and consulates around the world.

Under interoperability, PSS submits an individual's fingerprints in order to ascertain his or her immigration status. Fingerprints that match in IDENT generate IAQs that are sent to ACRIMe. ICE researches the individual and sends IARs back to the FBI CJIS Division. The FBI CJIS Division then passes the information it receives from DHS to PSS. PSS incorporates this information into the investigation that it is performing.

### Individuals Impacted:

Individuals who are seeking employment with DOS or access to DOS facilities.

### Data Elements:

ACRIMe may return various information to the FBI CJIS Division about the individual, which the FBI CJIS Division then passes on to DOS/DS/SI/PSS:

- Name and aliases;
- Date and place of birth;
- Identifiers, including Alien Registration number and FBI number;
- ICE office controlling the alien's Alien File (File Control Office); and
- Information regarding the legal status of the individual.

Please see DHS/ICE/PIA–020 for a more complete discussion of the data elements contained in ACRIMe.

 **Homeland Security**

**APPENDIX C**

**Organization:**

Federal, state, local, and tribal criminal justice agencies.

**Purpose and Use:**

When federal, state, local, and tribal criminal justice agencies investigate, arrest, and/or book a transfer to another criminal justice agency, conduct parole and probation activities, or take any other law enforcement action against an individual for a potential or actual violation of a criminal statute, they generally fingerprint the person. After fingerprints are taken, the criminal justice agency electronically submits the fingerprints to the FBI either directly or through their respective State Identification Bureau (SIB). Through interoperability, fingerprints that match in IDENT generate IAQs that are sent to ACRIMe. ICE researches the individuals and sends IARs back to the FBI CJIS Division. The FBI CJIS Division then passes the information it receives from DHS to the criminal justice agency.

**Individuals Impacted:**

Any individual, including U.S. persons: 1) who is being investigated; 2) who is being arrested and/or booked; 3) who is being transferred to another criminal justice agency; 4) with parole and probation activities; or 5) for whom any other law enforcement action is being taken against that individual for a potential or actual violation of a criminal statute.

**Data Elements:**

ACRIMe may return various information to the FBI CJIS Division about the individual, which the FBI CJIS Division then passes on to the criminal justice agency:

- Name and aliases;
- Date and place of birth;
- Identifiers, including Alien Registration number and FBI number;
- ICE office controlling the alien's Alien File (File Control Office); and
- Information regarding the legal status of the individual.

Please see DHS/ICE/PIA–020 for a more complete discussion of the data elements contained in ACRIMe.

# UNITED STATES v. ROMERO-LOPEZ

## Case No. 18-cr-00096-LTB

Attachment 5



**U.S. Department of Homeland Security**
Immigration and Customs Enforcement

## REPORT OF INVESTIGATION

| | | |
|---|---|---|
| **Title: Cupatzieeri BARCENAZ-De Paz** | **File Number**: A098 486 234 | **Date**: 05/16/2019 |
| **Charge: 8 U.S.C. 1326(a) and (b)(2)** | Unlawful Aggravated Felony Re-Entry | **Report Number**: |
| **Deportation Officer:** *(Name)*          *(Signature)*<br><br>Gregory Davies, Deportation Officer | | **Office:**<br>Centennial, Colorado |
| **Approved by:** *(Name and Title)*          *(Signature)*<br><br>Samuel Edwards, Supervisory Detention and Deportation Officer | | **Office:**<br>Centennial, Colorado |

### SYNOPSIS

Cupatzieeri BARCENAZ-De Paz, AKA RAMIREZ, Eduardo, is a 23-year-old male, native and citizen of Mexico by birth in Mexico City, Mexico, on July 17, 1995. BARCENAZ is currently in custody with the US Marshals, in Denver, Colorado. He last entered the United States unlawfully at or near El Paso, Texas, on or about September of 2018. A records search of NCIC and agency indices reveal that FBI# 875202KD6 pertains to BARCENAZ, as well ICE File A098 486 234. BARCENAZ was also determined to have been last removed from the U.S. to Mexico on March 13, 2018, through El Paso, Texas, subsequent to a conviction classified as an aggravated felony.

### ENCOUNTER

On April 26, 2019, Immigration and Customs Enforcement (ICE) determined that BARCENAZ had reentered the United States upon receiving a biometric hit confirmation, based on fingerprint identification, from the Law Enforcement Support Center (LESC), after he was detained by local law enforcement in Thornton, Colorado. The Thornton Police Department encountered and cited BARCENAZ on suspicion of Driving Under the Influence (DUI). At time of initial encounter,

Form G-166 (Rev. 9-1-85) N

BARCENAZ presented a "U.S. Resident Card" bearing his photo, along with the name "Eduardo Ramirez" and a date of birth of July 17, 1995. (Records checks confirm the Alien Registration Number listed on the card is a valid number assigned to a female native of Brazil and naturalized U.S. citizen.) BARCENAZ was transported to the Thornton Police Substation, issued a summons and complaint for DUI, and released on April 27, 2019. Throughout the encounter, BARCENAZ verbally identified himself as, and signed all paperwork under the name "Eduardo Ramirez". Thornton officials did not learn of BARCENAZ' true identity until after his release, based on the booking fingerprints previously obtained. ICE then received notification of the encounter, via ACRIME, several hours after his release from custody.

On April 26, 2019, BARCENAZ claimed he was presently residing at 301 East Malley Drive, Apartment # 345, Northglenn, CO 80233. On May 1, 2019, ICE Fugitive Operations DO Martin Mendez conducted routine surveillance at the reported address and, at approximately 0630 hours, visually identified BARCENAZ as he exited the area immediately adjacent to apartment # 345 and onto a walkway leading towards the parking lot. Once in the parking lot, BARCENAZ was observed getting into the driver's seat of a black Jeep Grand Cherokee bearing Colorado plate CIV960 (VIN# 1J4GW48S3YC297540), which is registered to "Gema Barcenaz". Information found within his administrative file confirms this individual is, in fact, BARCENAZ' sister. On May 8, 2019, ICE Supervisory Detention & Deportation Officer (SDDO) Kevin Cruz, repeated surveillance at the reported address and, at approximately 0638 hours, observed BARCENAZ depart the building in the same area and enter the same vehicle, as was observed by DO Mendez on May 1, 2019. Each time BARCENAZ was observed leaving the residence, he was followed to his work located at 104th Ave and Joliet Str in Henderson, Colorado. On May 14th and 15th, the car was not located at the address, but seen at the worksite.

On May 16, 2019, members from the ICE Special Response Team (SRT) assisted by members of the operation teams conducted surveillance at the original address of 301 East Malley Drive, APT # 345, Northglenn, CO 80233, but the car was not located. The teams then were placed in different locations at the known worksite at 104th Ave and Joliet Str. At 0653 DO Jerimee Joyner identified the black Jeep Grand Cherokee bearing Colorado plate CIV960, and was able to visually identify the driver as BARCENAZ. He then followed the car maintaining visual as it proceeded to the worksite. At 0655 SDDO Cruz activated his emergency lights behind the target vehicle, and as it turned onto Joliet, it yielded to the side of the road. The approach team consisting of DOs Martin Mendez, Jefferey Jenkins, Christopher Harms and Abraham Luna, approached the BARCENAZ and gave him verbal commands to exit the vehicle. BARCENAZ did not respond to the officer's commands, and DO Mendez, approached the driver's side door, opened it and escorted BARCENAZ out of the vehicle. BARCENAZ was placed into custody at 0655. BARCENAZ was transported to the Denver Field office without incident.

## INTERVIEW / SWORN STATEMENT

On May 16, 2019, BARCENAZ was advised of his Miranda Rights by DO Luna. BARCENAZ waived his rights and agreed to provide a sworn statement without the presence of an attorney. In the affidavit, BARCENAZ admitted to his true and correct name as Cupatzieeri BARCENAZ-De Paz. BARCENAZ also stated that he is a citizen and native of Mexico, born in Mexico City, Mexico, on July 17, 1995. BARCENAZ admitted to illegally entering the United States on or about September of 2018, at or near El Paso, Texas, by walking across the border. BARCENAZ states he entered the United States without inspection by an immigration officer. He also admitted he was previously deported from the United States through El Paso, Texas, but could not remember the date. BARCENAZ further admitted that he did not seek permission from the United States Attorney General to reenter the United States after his removal. BARCENAZ admitted to the officers that he intentionally used false names because he was afraid that this would happen, in his statement he said, I didn't want anyone to find me. Anyone, especially because of my record and because in Mexico I was afraid of my tattoos.

From the record of sworn statement, immigration and criminal record checks, and from fingerprint identification, ICE/ERO agents determined that BARCENAZ was a previously removed aggravated felon alien who was found within the United States in violation of law. It was revealed that he had re-entered the U.S. unlawfully, without benefit of inspection and admission, on or about September of 2018. It was also determined that BARCENAZ had re-entered the United States without having obtained prior permission or consent from the U.S. Attorney General or the Secretary of Homeland Security to re-apply for lawful admission. BARCENAZ was processed for administrative removal through the reinstatement of his prior order of removal, pursuant to Section 241 (a) (5) of the Immigration and Nationality Act (INA).

## PROOF OF ALIENAGE

After being advised of Miranda, BARCENAZ provided a sworn statement, dated May 16, 2019, in Centennial, Colorado, wherein he admitted to being a citizen of Mexico.

## CONVICTIONS

BARCENAZ was, on June 20, 2017, convicted in the 243rd District Court of Texas, El Paso County, for the Offense of Sexual Assault on a Child, a 2nd Degree Felony in violation of 22.011(A)(2) PC, for which BARCENAZ was placed on community supervision for a period of ten (10) years.
Case Number 20170D01344

BARCENAZ was, on March 2, 2016, convicted in the 41st District Court of Texas, El Paso County, for the offense of Possession of a Controlled Substance, to wit: Methamphetamine, a Class A Misdemeanor offense in violation of section 481-116(b) of the Texas Health & Safety Code), for which BARCENAZ was sentenced to one (1) day of confinement.
Case Number 20150D03820

Form G-166 (Rev. 9-1-85) N

BARCENAZ has an active non-extraditable arrest warrant out of El Paso County, Texas for the offense of Assault Causing Bodily Harm.

Warrant Number W182825862

## REMOVALS / DEPORTATIONS

A review of the administrative case file indicates that BARCENAZ:

- First entered the United States illegally on or about June 21, 1999, at or near El Paso, Texas.

- Became a Lawful Permanent Resident on November 01, 2012.

- Was ordered removed to Mexico by an immigration judge in Chaparral, New Mexico, on January 19, 2018.

- Was removed to Mexico on March 13, 2018, through El Paso, Texas.

- Illegally re-entered the United States on or about September of 2018, at or near El Paso, Texas.

- Encountered by ICE in the District of Colorado on April 26, 2019. BARCENAZ was served with a Notice of Intent / Decision to Reinstate his Prior Order of Removal on May 16, 2019, in Centennial, Colorado.

Violation/Venue

Violation is: **8 USC §1326(b) (2) Re-entry After Removal Following an Aggravated Felony Conviction; criminal penalties for reentry of certain removed aliens [INA § 276]**

**(a)** Subject to subsection (b) of this section, any alien who--

**(1)** has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

**(2)** enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from a foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior act, shall be fined under Title 18, or imprisoned not

more than 2 years, or both.

**(b)** Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection--

**(1)** whose removal was subsequent to a conviction for three or more misdemeanors involving drugs, crimes against the person, or both, or a felony (other than an aggravated felony), such alien shall be fined under Title 18, imprisoned not more than 10 years, or both; or

**(2)** whose removal was subsequent to a conviction for the commission of an aggravated felony, such alien shall be fined under Title 18, imprisoned not more than 20 years, or both.

**Venue lies in the District of Colorado**.

Evidence/Testimony

| | | | |
|---|---|---|---|
| Immigration Judge's Order | 3 Pages | Order of the Immigration Judge signed in Chaparral, New Mexico, on January 19, 2018, under A098 486 234. | Exhibit "A" |
| I-205 | 2 Pages | Warrant of Removal/Deportation properly signed and executed in El Paso, Texas, on March 13, 2018. | Exhibit "B" |
| I-215B | 3 Pages | Record of sworn statement properly executed and served at Centennial, Colorado, on May 16, 2019. | Exhibit "C" |
| I-871 | 1 Page | Notice of Intent/Decision to Reinstate Prior Order properly served and signed at Centennial, Colorado, on May 16, 2019. | Exhibit "D" |
| FD-249 | 2 Pages | Criminal Fingerprint Card properly executed in Thornton, Colorado on April 27, 2019. | Exhibit "E" |
| Fingerprint Analysis | 1 Page | Fingerprint comparison by Colorado Bureau of Investigation comparing exhibits "A" with "B", dated May 9, 2019. | Exhibit "F" |

| Judgment in Criminal Case (Case No. 20170D01344) | Judgment in Criminal Case for June 20, 2017. BARCENAZ was convicted in the 243rd District Court of Texas, El Paso County, for the Offense of Sexual Assault on a Child, a 2nd Degree Felony in violation of $22.011(A)(2)$ PC, for which BARCENAZ was placed on community supervision for a period of ten (10) years. | Exhibit "G" |
|---|---|---|
| Judgment in Criminal Case (Case No. 20150D03820) | Judgment in Criminal Case for March 2, 2016. BARCENAZ was convicted in the 41st District Court of Texas, El Paso County, for the offense of Possession of a Controlled Substance, to wit: Methamphetamine, a Class A Misdemeanor offense in violation of section 481-116(b) of the Texas Health & Safety Code), for which BARCENAZ was sentenced to one (1) day of confinement. | Exhibit "H" |

Testimony:

Deportation Officer Martin Mendez
DHS/ICE Enforcement & Removal
12445 E. Caley Avenue
Centennial, CO 80111
(720) 875-2023

Deportation Officer Gregory Davies
DHS/ICE Enforcement & Removal
12445 E. Caley Avenue
Centennial, CO 80111
(720) 873-2864

Fingerprint Identification Technician
Colorado Bureau of Investigations
690 Kipling Street, Suite 2000
Denver, CO 80215

Form G-166 (Rev. 9-1-85) N

Reba Anderson
US Citizenship and Immigration Services
12484 East Weaver Place
Centennial, CO 80111
(720) 852-6868

Form G-166 (Rev. 9-1-85) N

INV_00000007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 18-cr-00096-LTB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DEIVY ROMERO-LOPEZ,

      Defendant.

---

**DEFENDANT'S OBJECTIONS TO THE ADDENDUM
TO THE PRESENTENCE REPORT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant, Deivy Romero-Lopez, by and through his attorney of record, Assistant Federal Public Defender Matthew K. Belcher, and hereby submits the following objections to the Addendum to the Presentence Report, filed with the Court on June 24, 2019, and would show as follows:

**I.**      **2015 Guidelines Manual:**

In the Addendum, Probation has incorrectly calculated the advisory guidelines range that would apply to Mr. Romero-Lopez. Probation's error is that it is attempting to use a conviction that occurred on August 4, 2017, to increase the base offense level for an Illegal Reentry that occurred on July 11, 2016. As § 2L1.2(b)(1) of the 2015 Guidelines Manual clearly states, "if the defendant previously was deported, or unlawfully remained in the United States, *after* a conviction for a felony that is…a crime of violence, increase by 16 levels."

Mr. Romero-Lopez was not deported *after* sustaining a conviction that qualifies as a crime of violence. Mr. Romero-Lopez was last deported from the United States on July 6, 2013, through the Port of Entry in Eagle Pass, Texas. *See* PSR, page 4. Mr. Romero-Lopez had not yet sustained a conviction for felony menacing, which occurred on August 4, 2017, prior to his last deportation, which occurred on July 6, 2013. As such, Mr. Romero-Lopez, under the 2015 Guidelines Manual, would not be subject to the 16-level increase being advocated by Probation. The calculations contained in Mr. Romero-Lopez's previous objections to the Presentence Report are correctly calculated.

## II.   Criminal History Category:

Mr. Romero-Lopez was found to have returned to the United States on July 11, 2016, when he was arrested by the Adams County Sheriff's Office, fingerprinted, processed, booked, and then released to a detox facility. Probation does not deny this evidence, but merely tries to sweep it under the rug by suggesting, without evidence, that Mr. Romero-Lopez *could have* returned to Mexico after his July 11, 2016, arrest, but quickly returned prior to his May 27, 2017, arrest. *See* PSR, page 5, footnote 2. However, as aptly noted by Judge Blackburn in *Hart v. Colvin*, "[t]he lack of evidence is not evidence, and does not constitute an adequate substitute for proper analysis of the evidence…" 67 F.Supp.3d 1280, 1284 (D.Colo. 2014).

The proper analysis of the evidence here requires the Court to determine whether the government knew, or could have known through the exercise of diligence typical of law enforcement, that on July 11, 2016, when Mr. Romero-Lopez was arrested by the Adams County Sheriff's Office, (1) Mr. Romero-Lopez was a prior deportee; (2) Mr. Romero-Lopez was illegally present in the United States; and (3) Mr. Romero-Lopez's whereabouts. *See United States v. Olivas-Perea*, 297 F.Supp.3d 1191, 1207 (D. New Mexico, 2017). If the answer is yes, then

Mr. Romero-Lopez was found in the United States on July 11, 2016, and, at that time, he was not under a criminal justice sentence – meaning he should not receive the two additional criminal history points being advocated by Probation. With a total offense level of 10 and a criminal history category of V, Mr. Romero-Lopez's 2015 advisory guidelines range would be **21 to 27 months**.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

/s/ Matthew K. Belcher
MATTHEW K. BELCHER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Matthew_Belcher@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2019, I electronically filed the foregoing *Defendant's Objections to the Addendum to the Presentence Report* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Daniel Robert McIntyre, Assistant U.S. Attorney
Email: daniel.mcintyre@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Deivy Romero-Lopez
via mail

/s/ Cecilia Hernandez
Cecilia Hernandez, Legal Assistant
Office of the Federal Public Defender

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.  18-cr-00096-LTB

        UNITED STATES OF AMERICA,

                Plaintiff,

v.

        DEIVY ROMERO-LOPEZ
                *a/k/a Davie Romero-Lopez*
                *a/k/a Jonathan Aria-Ramirez*

                Defendant.

---

**UNITED STATES' RESPONSE TO THE DEFENDANT'S OBJECTION TO THE PSIR**
**[ECF-27]**

---

        The United States of America, through the undersigned Special Assistant U.S.

Attorney hereby submits its response to the defendant's objection to the PSIR [ECF-27].

        In his objection, the defendant objects to four separate aspects of PSIR.

    1.  <u>Response to the defendant's Objection No. 1</u>

        The defendant asserts that the Court should use the 2015 guideline manual when

calculating his advisory guideline range.  His position is based on the claim that he was

"found" in the United States at the time he was stopped for driving under the influence in

Adams County, Colorado in 2016.  The defendant is mistaken.  The Court should use one

of two dates as the operative date in this case, either May 27, 2017 or January 3, 2018.

Either date would result in using the 2018 guideline manual as relied on by the probation department.

Illegal Re-entry in violation of 8 U.S.C. § 1326(a) is a continuing offense. *United States v. Villarreal-Ortiz*, 553 F.3d 1326, 1330 (10th Cir. 2009). Illegal Re-entry is "first committed when the defendant voluntarily reenters the country and continues to be committed until the defendant is 'found.'" *Id.* An alien is "found" when the government knows or should know with the exercise of typical diligence 1) that the alien is a prior deportee, 2) that the defendant is illegally present in the United States, and 3) the defendant's location. *Id.* Although it is unknown exactly when the defendant returned, the Guideline Manual provides that "the last date of the offense of conviction is the controlling date for *ex post facto* purposes." U.S.S.G. § 1B1.11(b)(1) and application note 2. The defendant in this case has stipulated to having been "found" on January 3, 2018. *See* [ECF-1] and [ECF-23] (plea agreement with stipulation of facts).

Even if the Court did not bind the defendant to his stipulation of the date of offense, the underlying fact do not support his claim either. The defendant was not "found" in July 2016 because immigration authorities were not aware of his presence and could not have been so aware using reasonable diligence. The documents submitted by the defendant demonstrate that he was not arrested, but, instead, was issued a summons. Consequently, he was never booked into the system and Immigration and Customs Enforcement (ICE) was not notified of his presence. ICE would have no way of knowing of a local DUI arrest unless specifically notified and it is unreasonable to impute the knowledge of local authorities – not tasked with enforcing immigration laws – to ICE. The

defendant is largely accurate in his description of the Secure Communities program. In a nutshell, that program provides notification to ICE when an individual is arrested and booked into jail by state or local law enforcement. However, the defendant was not arrested and booked into jail in 2016, so no notification was made under the program. Rather, when the defendant was contacted by local law enforcement in July 2011, he was transported to an Adams County Sheriff's Office substation so the officer could administer a test to determine the defendant's blood alcohol content. [ECF-27-1, p.4 of 15]. He was then issued a summons and notice of revocation and was released to a detox facility. *Id.*

The defendant was next contacted by law enforcement on May 27, 2017. The defendant <u>was</u> booked into jail and ICE <u>was</u> electronically notified of his presence. However, ICE was not able to physically encounter the defendant until January 3, 2018 when he was in custody in El Paso County, Colorado. Although government believes the January 3, 2018 date is the correct "found" date, there is a colorable argument that ICE was aware of the defendant's presence and location on May 27, 2017 based on the fingerprint "hit" from Adams County. Consequently, the government believes the Court should apply as the operative date whichever of those two dates is most favorable to the defendant if there is any difference between the two. However, neither date would support using the 2015 Sentencing Guideline Manual.

2. <u>Response to the defendant's Objection No. 2</u>

The government agrees with the defendant and probation that the conviction in paragraph 32 receives two criminal history points.

3. Response to the defendant's Objection No. 3

The government agrees with the defendant that no criminal history points should be added for being under a criminal justice sentence at the time this offense was committed. While the government believes the January 3, 2018 is technically the correct "found" date, based on the discussion above regarding the defendant's May 27, 2017 arrest, the Court should give the benefit of the doubt to the defendant and use that date for guideline purposes. The defendant was not under a criminal justice sentence on May 27, 2017 so the two points would not apply.

4. Response to the defendant's Objection No. 4

The United States disagrees with the defendant's analysis but believes this is an issue better reserved for argument. Thus, the government will further address the issue of supervised release at the sentencing hearing, if appropriate.

Conclusion

Based on the positions above, the government believes the defendant's total offense level is 19, and he has eleven criminal history points resulting in a criminal history category of V. Thus, his advisory guideline range should be 57-71 months.

Respectfully submitted June 26, 2019

                              JASON R. DUNN
                              UNITED STATES ATTORNEY

BY:     *s/ Daniel R. McIntyre*
          Daniel R. McIntyre
          Special Assistant United States Attorney
          1801 California St. Suite 1600
          Denver, CO 80202
          Tel: 303-454-0100
          Daniel.McIntyre@usdoj.gov

          Attorney for the Government

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send an email notification of such filing to all counsel of record.

_s/ David Vu_
David Vu
Legal Assistant
United States Attorney's Office

AO 245B (Rev. 02/18)   Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

District of Colorado

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**v.**<br><br>DEIVY  ROMERO-LOPEZ<br>*a/k/a Davie Romero-Lopez*<br>*a/k/a Jonathan Aria-Ramirez* | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:  1:18-cr-00096-LTB-1<br><br>USM Number:  17144-308<br><br>Matthew Kyle Belcher<br><small>Defendant's Attorney</small> |

## THE DEFENDANT:

☒ pleaded guilty to count(s)    1 of the Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 8 U.S.C. § 1326(a) and (b)(1) | Illegal Re-entry of Removed Alien Subsequent to a Felony Conviction | 01/03/2018 | 1 |

   The defendant is sentenced as provided in pages 2 through _____4_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____  ☐ is  ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

July 19, 2019
<small>Date of Imposition of Judgment</small>

s/Lewis T. Babcock
<small>Signature of Judge</small>

Lewis T. Babcock, Senior United States District Judge
<small>Name and Title of Judge</small>

July 24, 2019
<small>Date</small>

AO 245B (Rev. 02/18) Judgment in Criminal Case

Judgment — Page   2   of   4

DEFENDANT:        DEIVY ROMERO-LOPEZ
CASE NUMBER:      1:18-cr-00096-LTB-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **fifty-seven (57) months, to run concurrent to sentence imposed in Adams County District Court, Case Number 17CR1930 and El Paso County District Court, Case Number 18CR93.**

☐   The court makes the following recommendations to the Bureau of Prisons:

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

   ☐   at _____   ☐ a.m.  ☐ p.m.   on _____ .

   ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐   before 2 p.m. on _____ .

   ☐   as notified by the United States Marshal.

   ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 02/18) Judgment in Criminal Case

| | | Judgment — Page 3 of 4 |
|---|---|---|

DEFENDANT: DEIVY ROMERO-LOPEZ
CASE NUMBER: 1:18-cr-00096-LTB-1

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on the following page.

| | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the following page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 02/18) Judgment in Criminal Case

Judgment — Page ___4___ of ___4___

DEFENDANT:        DEIVY  ROMERO-LOPEZ
CASE NUMBER:      1:18-cr-00096-LTB-1

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☐  Lump sum payment of  $ _____  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☐  F below; or

B  ☒  Payment to begin immediately (may be combined with  ☐  C,  ☐  D, or  ☐  F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of  $ _____  over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of  $ _____  over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
    and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 18-cr-00096-LTB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DEIVY ROMERO-LOPEZ,

      Defendant.

---

## NOTICE OF APPEAL

---

TO THE HONORABLE JUDGE OF SAID COURT:

      COMES NOW the Defendant, Deivy Romero-Lopez, by and through undersigned counsel, Assistant Federal Public Defender Matthew K. Belcher, and hereby files this notice of appeal to the Tenth Circuit Court of Appeals, and appeals the Judgment in a Criminal Case that was entered on July 24, 2019.

                    Respectfully submitted,

                    VIRGINIA L. GRADY
                    Federal Public Defender


                    /s/ Matthew K. Belcher
                    MATTHEW K. BELCHER
                    Assistant Federal Public Defender
                    633 17th Street, Suite 1000
                    Denver, CO  80202
                    Telephone:  (303) 294-7002
                    Fax:  (303) 294-1192
                    Email:  Matthew_Belcher@fd.org
                    Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2019, I electronically filed the foregoing *Notice of Appeal* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

> Daniel Robert McIntyre, Assistant U.S. Attorney
> Email:  daniel.mcintyre@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

> Deivy Romero-Lopez
> via mail

> /s/ Cecilia Hernandez
> Cecilia Hernandez, Legal Assistant
> Office of the Federal Public Defender